# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Ex Parte Application of Novexco** ) <br> **(Cyprus) Limited, NMLK** ) <br> **PENNSYLVANIA CORP. and** ) <br> **GENERALI ITALIA, S.P.A. for an** ) <br> **Order Pursuant to 28 U.S.C. § 1782 to** ) <br> **Conduct Discovery for Use in a** ) <br> **Foreign Proceeding** ) | **MISC. ACTION NO.** |

## DECLARATION OF STEFANO TACCIOLI

I, Stefano Taccioli, a partner in the firm of Ghelardi & Associati, Via Assarotti 4, 16122

Genoa, Italy, and Italian counsel for Applicants, Novexco (Cyprus) Limited ("Novexco"),

NMLK Pennsylvania Co. ("NMLK") and Generali Italia, S.p.A. ("Generali"), declare pursuant to

28 U.S.C. § 1746(1) as follows:

1. I am duly authorized to make this Declaration in support of Applicants' Ex Parte

   Application pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign

   Proceeding.

2. I am over the age of 18 and understand and believe in the obligation of an oath.

3. Novexco, NMLK and Generali are the owners/sellers, buyers and insurers, respectively,

   of a certain cargo of 52,514 metric tons of steel slabs loaded at Tuapse, Russia for

   carriage to Philadelphia, Pennsylvania on board the M/V FRATZESCOS, a Liberian flag

   oceangoing bulk carrier owned by Century Shipping & Trading Co. ("Century Shipping")

   and managed by Rainbow Shipmanagement, S.A. ("Rainbow Shipmanagement")

4. The carriage of goods is governed, *inter alia*, by a GENCON voyage charter party dated

   at Lugano, Switzerland as of November 4, 2014, between Novamarine Carriers, S.A., as

disponent owner of the M/V FRATZESCOS, and Novexco, as charterer of the vessel, and two CONGENBILL Bills of Lading Nos. PXBCTUPHFROSO101 and PXBCTUPHFROSO102 that list the consignee of the cargo as "To the Order of: Novexco."

5. Novexco is both the voyage charterer of the M/V FRATZESCOS and the seller of the cargo of steel slabs, as evidenced by the GENCON voyage charter party and two Commercial Invoices Nos. 14-12-4976-4988 and 14-12-4989-4999.

6. Novexco, in turn, has agreed to sell the cargo of steel slabs to NMLK which is the ultimate consignee of the cargo and, upon information and belief, payment for the goods shipped on board the M/V FRATZESCOS is schedule to be remitted by NMLK to Novexco in mid-April 2015.

7. On or about December 20, 2014, shortly after completion of loading and departure from Tuapse, Russia, the M/V FRATZESCOS reportedly sustained damage to her stern tube assembly and deviated to Malta as a port of refuge to ascertain the extent of damage.

8. The vessel subsequently sailed to Piraeus, Greece to carry out repairs afloat which necessitated partial discharge and storage of the cargo while repairs were effected.

9. As a result of the damage discovered and ensuing repairs, Century Shipping (the Owners of the M/V FRATZESCOS) has declared general average and obtained an Average Bond executed by Novexco and an Average Guarantee executed by Generali to guarantee cargo interests' contribution to legitimate general average expenses incurred by the vessel interests as a result of the damage reported to the stern tube assembly (assuming some are found to be legally due).

2

10. The M/V FRATZESCOS' general average expenses are preliminarily estimated to be in the $1,500,000.00 range.

11. While the Average Bond executed by Novexco is silent on the issue of jurisdiction and choice of law, the Average Guarantee executed by Generali provides for the jurisdiction of the High Court of Justice of England and Wales, and English law.

12. Accordingly, it is reasonably contemplated that a foreign proceeding will be filed in the near future, and Novexco, NMLK and Generali seek discovery of critical shipboard documents and evidence that are currently on board the M/V FRATZESCOS, which is expected to be within this Court's jurisdiction shortly (the vessel's current ETA at New Jersey is March 27, 2015).

13. Novexco, NMLK and Generali believe these crucial documents and evidence are critical to their ability to determine whether the M/V FRATZESCOS is entitled to declare a general average event as a result of the reported stern tube assembly damage (and whether the vessel interests are entitled to seek a general average contribution from cargo interests).

14. Generali dispatched a marine surveyor to Piraeus, Greece to attend on board the M/V FRATZESCOS during repairs in late January/early February 2015 (Giovanni Martinoli of Martinoli & C. S.R.L.).

15. However, the surveyor was restrained from speaking to the M/V FRATZESCOS' crew and was refused access to all requested relevant shipboard documents and evidence.

16. Given that Novexco, NMLK and Generali's surveyor was not given access to the M/V FRATZESCO's crew or critical, contemporaneous shipboard documents and other evidence, and given the limited information regarding Century Shipping's general

3

average declaration, Novexco, NMLK and Generali object to and intend to dispute Century Shipping's general average declaration, such that judicial proceedings relative to the general average claim and the Average Bond/Average Guarantee are within reasonable, imminent contemplation.

17. Without an order from this Court permitting Novexco, NMLK and Generali to serve the proposed subpoena on the Master of the M/V FRATZESCOS when that vessel calls at New Jersey , Novexco, NMLK and Generali will be deprived of crucial documents and evidence which are necessary to evaluate the merits of this general average claim.

18. English courts have accepted evidence obtained through United States judicial assistance under 28 U.S.C. § 1782 in the past. Attached hereto as Exhibit 1 is a copy of the House of Lords' decision in *South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien" NV* [1987] 1 App. Cas. 24 (1986).

19. In accordance with 28 U.S.C. § 1746(1), I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Genoa, Italy, this _24th_ day of March, 2015.

STEFANO TACCIOLI

4

24

Lord Mackay
of Clashfern                    Reg. v. Shivpuri (H.L.(E.))                    [1987]

with the Lord Chancellor's view. Otherwise I agree with the reasons   A
given by my noble and learned friend, Lord Bridge.

*Appeal against conviction dismissed.*
*Costs of appellant and respondent to*
*be paid out of central funds.*

Solicitors: *Francis & Co., Cambridge; Solicitor, Customs and Excise.*   B

C. T. B.

C

[HOUSE OF LORDS]

SOUTH CAROLINA INSURANCE CO.     .     .     .     RESPONDENTS

AND                                                              D

ASSURANTIE MAATSCHAPPIJ "DE ZEVEN
PROVINCIEN" N.V.     .     .     .     .     .     .     APPELLANTS

SOUTH CAROLINA INSURANCE CO.     .     .     .     RESPONDENTS

AND

AL AHLIA INSURANCE CO. AND ANOTHER     .     .     APPELLANTS   E

1986  May 6, 7;        Lord Bridge of Harwich, Lord Brandon of Oakbrook,
       July 29                    Lord Brightman, Lord Mackay of Clashfern and
                                          Lord Goff of Chieveley

*Injunction—Jurisdiction to grant—Foreign proceedings—Action*   F
*brought in England—Defendants lodging petition in United States*
*court for pre-trial discovery—Whether defendants to be restrained*
*from proceeding with petition under court's inherent jurisdiction*

The plaintiffs were an American insurance company, and,
having reinsured the liability of another American insurance
company, U.N.I., they reinsured the risk with the defendants in
London. The plaintiffs claimed under the contract of reinsurance
and, when the defendants disputed liability, they brought   G
proceedings in the Commercial Court. Before the defence was
served, the defendants lodged a petition in a United States
district court seeking, inter alia, an order for pre-trial discovery
of documents relevant to the claim and the plaintiffs' contract of
reinsurance with U.N.I., against persons resident in the United
States, who were not parties to the English action. On the
plaintiffs' application in the Commercial Court, the judge made   H
an order restraining the defendants from taking any further step
in the American proceedings or enforcing any order made
therein. On appeal by the defendants, the Court of Appeal
dismissed the appeal.

EXHIBIT

1

1 A.C.                 South Carolina Co. v. Assurantie N.V. (H.L.(E.))

**A**

On appeal by the defendants:—

*Held*, allowing the appeal, that although the power of the High Court to grant injunctions, which was a statutory power conferred by section 37(1) of the Supreme Court Act 1981, was very wide it was limited, save for two exceptions irrelevant to the present proceedings, to the situations (Lord Mackay of Clashfern and Lord Goff of Chieveley dubitante) (i) where one party to an action could show that the other party had either

**B**

invaded, or threatened to invade, a legal or equitable right of the former for the enforcement of which the latter was amenable to the jurisdiction of the court, and (ii) where one party to an action had behaved, or threatened to behave, in an unconscionable manner; that in the circumstances the plaintiffs had failed to show either that the defendants' conduct towards the plaintiffs was amenable to the jurisdiction of the court, or that it was

**C**

unconscionable in the sense that it interfered with the due process of the High Court's jurisdiction, and that, accordingly, the injunctions granted would be discharged (post, pp. 31c–d, 39h—40d, 41a–d, 44a–b, c–d, e, f).

*Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210, H.L.(E.); *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, H.L.(E.) and *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58,

**D**

H.L.(E.) applied.

*Per Lord Goff of Chieveley.* I am reluctant to accept the proposition that the power of the court to grant injunctions is restricted to certain exclusive categories. That power is unfettered by statute and it is impossible at the present time to foresee every circumstance in which it may be thought right to make the remedy available (post, p. 44g).

**E**

Decision of the Court of Appeal [1986] Q.B. 348; [1985] 3 W.L.R. 739; [1985] 2 All E.R. 1046 reversed.

The following cases are referred to in their Lordships' opinions:

*Bank of Tokyo Ltd. v. Karoon (Note)*, post, p. 45; [1986] 3 W.L.R. 414; [1986] 3 All E.R. 468, C.A.

*British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58; [1984] 3

**F**

W.L.R. 413; [1984] 3 All E.R. 39, H.L.(E.)

*Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; [1980] 3 W.L.R. 991; [1981] 1 All E.R. 143, H.L.(E.)

*Court of Commissioner of Patents for Republic of South Africa, In re* (1980) 88 F.R.D. 75

*Deere (John) Ltd. and Deere & Co. v. Sperry Corporation* (1985) 754 F. 2d 132

**G**

*MacShannon v. Rockware Glass Ltd.* [1978] A.C. 795; [1978] 2 W.L.R. 362; [1978] 1 All E.R. 625, H.L.(E.)

*Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210; [1977] 3 W.L.R. 818; [1977] 3 All E.R. 803, H.L.(E.)

The following additional cases were cited in argument:

**H**

*Armstrong v. Armstrong* [1892] P. 98

*Erhmann v. Ehrmann* [1896] 2 Ch. 611, C.A.

*Mike Trading and Transport Ltd. v. R. Pagnan & Fratelli (The Lisboa)* [1980] 2 Lloyd's Rep. 546, C.A.

*North Carolina Estate Co. Ltd., In re* (1889) 5 T.L.R. 328

26

South Carolina Co. v. Assurantie N.V. (H.L.(E.))　　　　　　[1987]

*Straker Brothers & Co. v. Reynolds* (1889) 22 Q.B.D. 262　　　　　A
*Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2), In re* [1978] A.C. 547; [1978] 2 W.L.R. 81; [1978] 1 All E.R. 434, H.L.(E.)

APPEAL from the Court of Appeal.

This was an appeal by leave of the House of Lords (Lord Scarman, Lord Templeman and Lord Mackay of Clashfern) dated 19 November B 1985 by the defendants, Assurantie Maatschappij "De Zeven Provincien" N.V., in the first action, and by the first defendants, Al Ahlia Insurance Co., and by the second defendants, Arabian Seas Insurance Co. Ltd., in the second action brought by the plaintiffs, South Carolina Insurance Co. from the judgment dated 23 May 1985 of the Court of Appeal (Griffiths, Slade and Lloyd L.JJ.) which affirmed orders made on 25 C April 1985 by Hobhouse J., the effect of which was to restrain the defendants from taking any further steps in proceedings before a Federal District Court of the United States for production and inspection of documents against a number of companies and individuals not party to the present actions.

The facts are set out in the opinion of Lord Brandon of Oakbrook.
　　　　　　　　　　　　　　　　　　　　　　　　　　　　D

*Robert Alexander Q.C.* and *Jonathan Sumption Q.C.* for the defendants. The point raised by this appeal is novel. The question can be stated in this way: in what circumstances (if any) may the English courts restrain a party to an English action from availing himself of the process of a foreign court for the purpose of obtaining evidence relevant to the English action? The most authoritative decisions in this branch of E the law are those of this House in *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210; *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557 and *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58.

In the present case the defendants against whom injunctive relief is sought availed themselves of a right open to them under the federal law F of the United States and applied to a United States district court for an order requiring persons resident in the United States, but who were not parties to the English proceedings, to give pre-trial discovery of documents relevant to the English action. The particular issue, therefore, in this appeal is whether in the present circumstances it is right for the English court to restrain the defendants from prosecuting further the proceedings in the United States district court.　　　　　　　　G

The rules of procedure in England provide a means whereby discovery can be obtained between parties to an action and witnesses can be subpoenaed to appear at the trial with relevant documents in their possession. The rules of procedure do not provide an exhaustive or exclusive code which prohibit a party from obtaining documents in any way other than those provided by the rules. For example, if a stranger to the action is prepared to give documents voluntarily to a party, that H party is entitled to receive them without obtaining a subpoena. Further, a party may use the facilities of the courts of a friendly foreign state if that state is willing for them so to do. The defendants concede that

27

**1 A.C.**          **South Carolina Co. v. Assurantie N.V. (H.L.(E.))**

A   there are limits to this principle. Thus, it is inapplicable where it would be unconscionable for a party to obtain discovery, for example, of documents which in this country are subject to professional privilege.

The documents sought are relevant to the defences pleaded in the action which in turn reflect enquiries which were pursued before the action was brought. The plaintiffs obtained the injunction in spite of refusing the defendants consent to have access to the documents in
B   question. Since then they have granted the defendants access but it is the view of the defendants' solicitors that the strangers to the action have not made proper disclosure. The documents are not in the power or possession or control of the plaintiffs; therefore it is difficult to see why they object to disclosure. If the strangers to the action were in this country they could be required to produce the documents by subpoena
C   duces tecum. As to any suggestion that the defendants could have applied for letters rogatory under R.S.C., Ord. 39, r. 2, the procedure is cumbersome and expensive and they can be issued only where other efforts have been made to obtain the documents in question.

As stated previously, after the Court of Appeal gave judgment the plaintiffs did arrange for the defendants to have controlled access to certain documents in the possession of certain third parties resident in
D   the United States. This was a facility which the defendants hoped would make the prosecution of the present appeal unnecessary. However, the restrictions imposed upon the defendants' inspection of documents made the facilities which were offered to them most unsatisfactory. They have therefore with regret concluded that certain documents have been withheld in a manner which can be remedied only by the compulsory
E   procedure of the United States district court.

28 United States Code, section 1782, is a clear provision enabling parties to an English action to obtain from the courts of the United States documents for use in proceedings in this country. That being the rule, the question then arises: on what principle should the English court prevent disclosure where the United States courts would allow disclosure directed to a company which is subject to the jurisdiction of the United
F   States courts? It is the plaintiffs' contention that in the circumstances it is unconscionable for the defendants to apply for disclosure of these documents. The Court of Appeal held that in principle a party to litigation in this country should not avail itself of 28 United States Code, section 1782, against non-parties resident in the United States.

Reliance is placed on the following propositions: (i) In principle it is open to the defendants to seek material to enable them to conduct their
G   case and to obtain that material as early as possible. A party can gather evidence for use in litigation either through the use of English procedures or through other means. (ii) There is no objection to these other means including means provided by United States proceedings. This does not, as the Court of Appeal suggested, deprive the English court of control over the proceedings. (iii) Caution is required before the conduct of any
H   foreign proceedings is restrained. (iv) The use of the United States processes could be restrained by injunction if it involved the breach of some legal or equitable right of the party claiming the injunction or was unjust or unconscionable to that other party but not otherwise. The

28

**South Carolina Co. v. Assurantie N.V. (H.L.(E.))**                    **[1987]**

defendants dissent from the general approach of the Court of Appeal in   A
the present case.

As to the authorities, reliance is placed on *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210, 211c–D, 255F–G, 256E–257, *per* Lord Diplock. As to *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, see *per* Lord Scarman, at pp. 572F–G, and 574D. It is to be noted that that was a forum conveniens case. In *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58,   B
the observations of Lord Diplock at pp. 80A–B et seq., and Lord Scarman at p. 95c, show that the category of cases there under discussion have no relevance to the issue in the present case. The defendants would apply by analogy to the present case the observations of Dunn L.J. in *Mike Trading and Transport Ltd. v. R. Pagnan & Fratelli (The Lisboa)* [1980] 2 Lloyd's Rep. 546, 551.   C

On the facts of the present case it is not unreasonable or unjust for the defendants to apply for the documents in question. It is said that the documents would be obtained earlier than if they were obtained by subpoena in the English proceedings. But this is only a quirk of English procedure. The advantage of being able to obtain the documents at an earlier stage of the proceedings is in no way unconscionable to the plaintiffs. This is particularly so since otherwise they are not likely to be   D
obtained at all. The defendants do not accept that the procedure by way of letters rogatory is open to them. Further, it is an expensive procedure. It cannot be unjust or unconscionable for the defendants to take the "direct route" for obtaining these documents.

As to the United States authorities cited by Griffiths L.J. [1986] Q.B. 348, 357, those authorities are not contemplating the situation   E
which has arisen in the present case. The principles laid down by the Court of Appeal here it may be said to act unconscionably against the defendants rather than the plaintiffs. [Reference was also made to *In re North Carolina Estate Co. Ltd.* (1889) 5 T.L.R. 328; *Straker Brothers & Co. v. Reynolds* (1889) 22 Q.B.D. 262, and *Bank of Tokyo Ltd. v. Karoon (Note)* [1987] A.C. 45.]

*Kenneth Rokison Q.C., Christopher Symons* and *Thomas Weitzman*   F
for the plaintiffs. Attention is drawn to the width of the inquiry requested by the defendants in the United States proceedings. They are seeking third party discovery which would not be allowed at all in England. The United States court will not allow that which would not be allowed by the court hearing the substantive issue between the parties. The defendants are in effect seeking to take part of the English   G
proceedings out of the jurisdiction and control of the English court. The difference between the disclosure of documents as a result of letters of request and the present case is that the defendants here have first gone to the foreign court and requested that court to make an order in English proceedings.

*In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, is the antithesis   H
of the present case. The House there held that an English court will not, even when so requested by a foreign court, make an order in respect of an English person or company requiring that person or company to give

**1 A.C.**          South Carolina Co. v. Assurantie N.V. (H.L.(E.))

A  documentary or testamentary discovery for the purposes of the foreign proceedings. The present case is the reverse position since although the American court is being asked to assist the English court, the American court is being asked to admit a wider class of documents than is allowable under English procedure. It is thus an even stronger case than the *Westinghouse* case. The correct way for the defendants to proceed in the present issue is under R.S.C., Ord. 39, r. 1. Further, Ord. 38, r. 9

B  specifically relates to depositions in any cause or matter and links them to those under Ord. 39, r. 1.

The approach of Griffiths L.J. in the Court of Appeal is adopted. The plaintiffs are prejudiced by the American procedure because the defendants can obtain documents which could not be obtained under English procedure. Further, the plaintiffs are necessarily prejudiced by

C  the costs and expense of the American proceedings for they are bound to take part in those proceedings to protect their interests. The question also arises whether, if the English court would not make an order for third party discovery as sought by the defendants, the American court would make any order at all. It is plain from the American decisions in *In re Court of Commissioner of Patents for Republic of South Africa* (1980) 88 F.R.D. 75, 77, and *John Deere Ltd. and Deere & Co. v.*

D  *Sperry Corporation* (1985) 754 F. 2d 132, 135, 136, that a United States court will only grant an applicant an order under 28 United States Code, section 1782, if it is satisfied that an order of the same nature would be made in like circumstances by the foreign court seised of the dispute at that stage of the proceedings. The effect of those decisions is that any American court properly advised as to English law on discovery would

E  deny the defendants' request as being for third party discovery which is not allowable under English procedure. If it be said that this question can be left for the United States district court to decide, the answer is that it is better for the English court to deal with the matter and "nip it in the bud." It may be that the United States court would not be properly advised as to the relevant English law.

F  The English court has jurisdiction to restrain a party to proceedings pending in England from seeking or continuing to seek interlocutory orders in a foreign jurisdiction for the purposes of those proceedings. The English court has an inherent jurisdiction to control its own proceedings. Further, it is well established that where proceedings are pending before the English court, and proceedings are brought in a foreign jurisdiction which concern the same issues, the English court has

G  a discretionary jurisdiction either to stay the English proceedings or to restrain by injunction a party to those proceedings from continuing to proceed in the foreign court. This jurisdiction was recognised by this House in *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58, 80D–F *per* Lord Diplock. This jurisdiction is commonly invoked in the so-called "forum conveniens" cases, where there is a choice of forum for determination of substantive issues between the parties. See *per* Lord

H  Scarman, at p. 95D. This jurisdiction must also exist where the foreign proceedings are of a purely interlocutory nature, but which overlap with the normal interlocutory processes before the English court. Indeed, it is an obvious and an "a fortiori" case. Thus here the United States

30

South Carolina Co. v. Assurantie N.V. (H.L.(E.))                    [1987]

proceedings are only ancillary proceedings and therefore there is no    A
reason why the English court should not have granted the injunction
appealed against.

  *The Lisboa* [1980] 2 Lloyd's Rep. 546 is distinguishable because that
was a case where proceedings were started in Venice in order to obtain
security if the action was subsequently instituted in Italy. That case
cannot be described as one of a foreign court's interlocutory jurisdiction
being invoked in English proceedings. It was not an interlocutory    B
application for the purposes of English proceedings. The line of cases
cited by Robert Goff L.J. in *Bank of Tokyo Ltd. v. Karoon (Note)*
[1987] A.C. 45, is closer to the present case. The present case is one
where it is proper to grant an injunction to protect the jurisdiction of
the English court.

  *Armstrong v. Armstrong* [1892] P. 98 lays down the correct approach    C
to the present problem; the principles stated there are applicable to the
present case. The essential question is: who should have control over the
present matter? The true answer is that it should be the English court
which should have control.

  Suppose that in the present case the plaintiffs had attempted in the
United States Court to obtain pre-trial depositions from the defendants'
employees. Such an application would surely be restrained because it    D
would be so alien to English procedure. So also third-party discovery is
alien to English procedure. The matter can be tested by the following
example. If a party went to an English court and asked it to issue letters
rogatory in relation to third parties' documents under Order 39, such an
application would be dismissed. If the party then went to the United
States court and requested it under 28 United States Code, section 1782,    E
the English court should intervene on the ground that it was vexatious;
the party having failed before the English court, it cannot obtain the
evidence by utilising a foreign jurisdiction. But the answer cannot be
any different merely because the party in question goes to the United
States court first as in the present case.

  *Erhmann v. Ehrmann* [1896] 2 Ch. 611, shows that the English court
will not grant letters rogatory except in relation to evidence which is    F
directly relevant to the issues in the case. Wider "discovery" will not be
made the subject of letters rogatory—let alone in respect of documents
held by a third party.

  In conclusion, it is the plaintiffs' contention that they have a legal or
equitable right which it is appropriate for the English court to protect by
injunction, namely the right, as parties to proceedings in the English    G
court, to have those proceedings conducted in accordance with the
procedural laws and practices of England, and of no other jurisdiction.
Moreover, it is their contention that the defendants' application for
interlocutory relief in the United States is unconscionable and unjust to
the plaintiffs. If granted, it would allow the defendants to take advantage
of procedural steps and remedies available under English procedural
law, while at the same time avoiding some of the restrictions on those    H
steps and remedies which would nevertheless continue to impinge upon
the plaintiffs.

  *Symons* followed.

**1 A.C.**                    **South Carolina Co. v. Assurantie N.V. (H.L.(E.))**

A    *Alexander Q.C.* in reply. In the present case it is accepted that there is an advantage under the foreign proceedings which cannot be obtained in the English proceedings. It is this factor which distinguishes the present case from *Armstrong v. Armstrong* [1892] P. 98, as applied by Robert Goff L.J. in the *Tokyo Bank* case *(Note)* [1987] A.C. 45. The defendants rely on the principle on which they opened this appeal, namely, that the plaintiffs can only succeed if they can show that the

B    defendants' application before the United States court is unconscionable. As to the principle adumbrated by Griffiths L.J. below, the manner in which a party gathers evidence is for that party. It may gather it voluntarily or in pursuance of a contract. These methods do not deprive the English court in any way of control of its own proceedings.

[Reference was also made to *In re Westinghouse Electric Corporation*

C    *Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, 562B–F.]

Their Lordships took time for consideration.

29 July.   LORD BRIDGE OF HARWICH.   My Lords, for the reasons given in the speech of my noble and learned friend, Lord Brandon of

D    Oakbrook, with which I agree, I would allow this appeal.

LORD BRANDON OF OAKBROOK.   My Lords, the question for decision in this appeal is a novel one and can be stated in this way. An action between A and B is pending before an English court. While it is pending B, exercising a statutory right potentially available to him under

E    the federal law of the United States, applies to a district court of the United States for an order that persons resident in the United States, who are not parties to the action before the English court, should give him pre-trial discovery of documents relevant to the issues in that action. In those circumstances, is it right for the English court, on the application of A, to grant an injunction against B prohibiting him from prosecuting further his proceedings in the United States district court?

F    Hobhouse J. at first instance, and the Court of Appeal (Griffiths, Slade and Lloyd L.JJ.) on appeal from him, have held that it is right for such an injunction to be granted. The parties enjoined (for in the instant case there are three of them) now bring a further appeal with the leave of your Lordships' House.

The background of the case is to be found in what can conveniently

G    be described as a three-tier insurance arrangement. The company which first insured the relevant risks was a United States company, United National Insurance Co. ("United National"). United National re-insured the risks which it had insured with another United States company, South Carolina Insurance Co. ("South Carolina"). South Carolina in turn re-re-insured the risks which it had re-insured with a number of other insurance companies in the London market. These other insurance

H    companies included a Dutch company, Assurantie Maatschappij "De Zeven Provincien" (Seven Provinces) and two Middle or Far Eastern companies, Al Ahlia Insurance Co. ("Al Ahlia") and Arabian Seas Insurance Co. ("Arabian Seas"). In or about 1984 South Carolina called

32

**Lord Brandon of Oakbrook**        South Carolina Co. v. Assurantie N.V. (H.L.(E.))        [1987]

A  upon Seven Provinces, Al Ahlia and Arabian Seas to pay substantial sums which South Carolina claimed to be due from them under the contracts of re-re-insurance concerned. Seven Provinces, Al Ahlia and Arabian Seas refused to make the payments asked for, denying that they were liable to do so.

B  As a result South Carolina brought two actions in the Commercial Court here in order to recover the sums which they claimed to be payable, together with interest on such sums. In the first action, which was begun on 12 December 1984, Seven Provinces is the sole defendant. In the second action, which was begun on 28 February 1985, Al Ahlia is the first defendant and Arabian Seas is the second defendant. It was the original intention of the solicitors acting for South Carolina to seek summary judgment in both actions under R.S.C., Order 14. However,

C  at an application to fix a date for the hearing of the Order 14 proceedings against Seven Provinces, counsel for the latter indicated that a number of substantial defences would be raised to South Carolina's claim. These defences included (1) misrepresentation or non-disclosure regarding the retention position on the part of South Carolina; (2) non-disclosure of a previous bad loss record on the business concerned; (3) excessive deductions from premiums; and (4) payment of claims outside

D  the limits of the relevant treaty.

The underwriting agent for United National through whom business was placed with it was Pacific General Agency Inc. ("P.G.A."). The loss adjusters who investigated the claims made against United National were Arthur Campbell-Husted and Co. ("Campbell-Husted"). The principal place of business of both P.G.A. and Campbell-Husted is in the State of Washington.

E  My Lords, Seven Provinces, Al Ahlia and Arabian Seas ("the re-re-insurers") are, by reasons of their position, remote from the facts in dispute, and obliged to rely for detailed information about them on such documents as they can obtain from South Carolina or P.G.A. and Campbell-Husted. The latter two, however, were not the agents of South Carolina in connection with the relevant transactions; it follows that discovery of documents by South Carolina in the two actions in

F  England would not extend to relevant documents held by them. In this situation, if the re-re-insurers are to achieve their legitimate object of inspecting and copying where necessary, relevant documents held by P.G.A. and Campbell-Husted, some other means have to be found to enable them to do so.

G  In November 1984, after South Carolina had put forward its claims against the re-re-insurers, but before the two actions in England were begun, the latter had asked P.G.A. if they could inspect the documents in which they were interested at Seattle on 7 December 1984. P.G.A. referred the request to their principal, United National, which in turn consulted South Carolina. It appears that, on the advice of South Carolina's English solicitors, the request for inspection was, in effect,

H  refused. The two actions in England were subsequently begun.

My Lords, 28 United States Code, section 1782, provides:

"Assistance to foreign and international tribunals and to litigants before such tribunals. (a) The district court of the district in

33

1 A.C.      South Carolina Co. v. Assurantie N.V. (H.L.(E.))    Lord Brandon of Oakbrook

A    which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a foreign or international tribunal. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a

B    person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or in part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the

C    document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure."

D    On 28 March 1985, before the re-re-insurers had served their points of defence and counterclaim in the two actions against them in England, they applied by motion to the district court of the United States, Western District of Washington, at Seattle, for an order under section 1782 above. The motion, the title of which referred to the two actions in England, asked for an order against P.G.A. and Campbell-Husted involving two matters. The first matter was the production and inspection of numerous specified classes of documents of the kind which could

E    reasonably be expected to have come into being in the course of the transaction of the insurance business which had led to United National, having settled claims itself, to recover from South Carolina as its re-insurers, and to South Carolina then claiming to recover over from the re-re-insurers. The second matter was the appearance of three named persons from P.G.A. and Campbell-Husted to give testimony by deposition. The motion was supported by a memorandum and an

F    affidavit.

Notice of the re-re-insurers' motion was served on P.G.A. and Campbell-Husted. South Carolina was also served with notice of the motion, or otherewise made aware of its having been lodged. Neither P.G.A. nor Campbell-Husted appeared before the district court to resist the application. South Carolina, however, did so appear, and having

G    indicated their objection to it, was given until 29 April 1985 to file its affidavit in opposition. It is to be inferred from the foregoing that neither P.G.A. nor Campbell-Husted objects to producing the documents listed in the motion for inspection, and where necessary for copying, by the re-re-insurers, and that it is only the objection of South Carolina that has stood in the way of their doing so.

H    On 24 April 1985, before the date fixed for filing its affidavit in opposition in the United States district court, South Carolina issued summonses in the two actions in England. By their summonses South Carolina sought (1) an order that the re-re-insurers should withdraw their application to the United States district court, (2) an injunction

1987 A.C.—2

34

Lord Brandon
of Oakbrook          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          [1987]

restraining the re-re-insurers from proceeding further with such   A
application, and (3) a declaration that the application was an abuse of
the process of the English court.

My Lords, the summonses were heard by Hobhouse J. on 25 April
1985. He declined to make the declaration asked for, but granted South
Carolina injunctions restraining the re-re-insurers until further order
from taking any further steps in their motion before the United States
district court and from enforcing any order made by that court on such   B
motion. The main ground on which Hobhouse J. decided to grant such
injunctions appears from pp. 10 and 11 in Appendix I to the printed
case. Having set out what he called the framework of the matter, he
said:

"It involves a question of principle as to whether or not the English
court should retain the control of its own procedure and the   C
proceedings that are before it. I have no doubt that the answer to
be given to that question is that the English court should retain that
control."

The decision of Hobhouse J. was, as I indicated earlier, affirmed by
the Court of Appeal [1986] Q.B. 348. Griffiths L.J. gave the principal
judgment, with which Slade and Lloyd L.JJ. both agreed. The main   D
reason which Griffiths L.J. gave for his decision was similar to that
relied on by Hobhouse J. He said, at p. 358:

"Once the parties have chosen or accepted the court in which their
dispute is to be tried they must abide by the procedure of that
country and that court must be master of its own procedure.   E
Litigation is expensive enough as it is, and if a party fighting a case
in this country has to face the prospect of fighting procedural battles
in whatever other jurisdiction his opponent may find a procedural
advantage it may impose intolerable burdens, and encourage the
worst and most oppressive form of procedural forum shopping. We
should set our face against any such situation developing.

"Severe dislocation to the timetable of the English litigation is a   F
readily foreseeable consequence of unrestrained access to foreign
procedural remedies. This is likely to cause hardship or inconvenience
not only to the other party to that litigation but will also affect
other litigants whose cases are listed upon forecasts dependent upon
litigation being conducted in accordance with our own rules of
procedure. As the judge said, the court will lose control of its own   G
proceedings. Furthermore, one party might be able to gain a very
unfair advantage in the English procedure if he was able to take the
deposition of and cross-examine a witness whom he would never
call on his own behalf at the trial, for example, the employees or
business associates of his opponent. I think Mr. Sumption [counsel
for the re-re-insurers] recognised this when he said he would be
content to accept the stay in respect of his application to take the   H
depositions of the witnesses from P.G.A. and Arthur Campbell-
Husted & Co. I am therefore satisfied that as a matter of principle
the court must have an inherent jurisdiction to make any necessary

35

1 A.C.              South Carolina Co. v. Assurantie N.V. (H.L.(E.))       Lord Brandon
                                                                          of Oakbrook

A      order to ensure that the litigation is conducted in accordance with
       its own procedures."

       My Lords, before examining the question whether Hobhouse J. and
       the Court of Appeal were right or wrong to grant the injunctions now
       appealed against, it is necessary to draw attention to a number of
       preliminary matters.

B      The first matter to which attention needs to be drawn is the existence
       of an essential difference between the civil procedures of the High Court
       in England on the one hand, and of courts of the United States on the
       other, with regard to what may be compendiously described as pre-trial
       discovery. Under the civil procedure of the High Court in England, pre-
       trial discovery may take two forms. The first form, which is far and
       away the more common, is by way of disclosure and inspection of
C      relevant documents under R.S.C., Ord. 24. The second form, which is
       comparatively rare, is by way of the asking and answering on oath of
       interrogatories under R.S.C., Ord. 26. Such discovery is, however,
       subject to two important limitations, one relating to its scope and the
       other to the stage of an action at which it normally takes place. So far as
       the scope of discovery is concerned, it is limited to the disclosure and
D      inspection of documents in the possession or power of the parties to the
       action, or to the asking and answering on oath of interrogatories as
       between such parties. So far as the stage of an action at which discovery
       normally takes place is concerned, it is the general rule that the two
       forms of discovery to which I have referred do not take place until the
       formal pleadings by both sides have been completed and the issues in
E      disputes thereby fully and clearly defined. In this connection, however,
       it is right to say that the court has power to order either form of
       discovery at any stage of an action, including a stage earlier than the
       completion of pleadings; but such power is rarely exercised and then
       only on special grounds, for instance when discovery is needed in order
       that justice may be done in interlocutory proceedings.

       Because of the first limitation to which I have referred, there is no
F      way in which a party to an action in the High Court in England can
       compel pre-trial discovery as against a person who is not a party to such
       action, either by way of the disclosure and inspection of documents in
       his possession or power, or by way of giving oral or written testimony. I
       would, however, stress the word "compel" which I have used in the
       preceding sentence, for there is nothing to prevent a person who is not a
G      party to an action from voluntarily giving to one or other or both parties
       to it either disclosure and inspection of documents in his possession or
       oral or written testimony.

       The procedure of the High Court in England, while not enabling
       parties to an action to compel pre-trial discovery as against a person
       who is not a party to such action, nevertheless affords ample means by
       which such a person, provided that he is within the jurisdiction of the
H      court, can be compelled either to give oral testimony, or to produce
       documents in his possession or power, at the trial of the action itself.
       Under R.S.C., Ord. 38, Part II, such a person may be compelled to give
       oral testimony at the trial by the issue and service on him of a subpoena

36

Lord Brandon
of Oakbrook        South Carolina Co. v. Assurantie N.V. (H.L.(E.))        [1987]

ad testificandum, or to produce documents in his power or possession    A
(so long as they are adequately described and defined) by the issue and
service on him of a subpoena duces tecum. The issue of such subpoenas
is in the first instance a ministerial rather than a judicial act, and a party
may therefore issue subpoenas of either kind as he thinks fit; the court,
however, has power to set aside any subpoena on proper grounds, for
instance, irregularity of form, irrelevance, oppressiveness or abuse of the
process.                                                                B

The procedure of the High Court in England includes a further
power of the court, conferred on it by R.S.C., Ord. 38, r.13, to order
any person to attend any proceedings in a cause or matter and produce
any document to be specified or described in the order, the production
of which appears to the court to be necessary for the purpose of that
proceeding. It has, however, long been established that this rule is not   C
intended to be used, and cannot properly be used, to enable a party to
an action to obtain pre-trial disclosure and inspection of documents in
the possession or power of a person who is not a party to such action. It
is a rule of limited application, involving the production of a document
or documents to the court itself rather than to either of the parties to an
action.

My Lords, the civil procedure of courts in the United States differs    D
essentially from that in the High Court in England in that under it
parties to an action can compel, as against persons who are not parties
to it, a full measure of pre-trial discovery, including both the disclosure
and production for inspection and copying of documents, and also the
giving of oral or written testimony. This power of compulsion can be,
and regularly is, used at an early stage of an action.                  E

The second matter to which attention needs to be drawn is that 28
United States Code, section 1782, as appears from its terms which I set
out earlier, expressly provides that an order made under it may prescribe
the practice and procedure, which may be in whole or in part the
practice and procedure of the foreign country or the international
tribunal, for taking the testimony or statement or producing the
document or other thing; and that, to the extent that the order does not   F
prescribe otherwise, the testimony or statement shall be taken, and the
document or other thing produced, in accordance with the Federal Rules
of Procedure.

Reference was made in the two courts below and again in your
Lordships' House to certain United States authorities which bear on the
exercise of a district court's powers under section 1782. In a decision of   G
the United States District Court of Pennsylvania, *In re Court of the
Commissioner of Patents for Republic of South Africa* (1980) 88 F.R.D.
75, 77, Judge Newcomer said:

"[1, 2] It is of great concern to this court that counsel for opponent
has not been able to represent to this court that the documents and
testimony for which opponents request a discovery order are
discoverable under South African law. Indeed, discussions with   H
counsel lead this court to suspect that these materials would *not* be
available through South African procedures. Clearly, this court
should not by its exercise of the discretion allowed it under section

37

1 A.C.          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          Lord Brandon
                                                                          of Oakbrook

A     1782 allow litigants to circumvent the restrictions imposed on discovery by foreign tribunals. Few actions could more significantly impede the development of international co-operation among courts than if the courts of the United States operated to give litigants in foreign cases processes of law to which they are not entitled in the appropriate foreign tribunals."

B     Further in *John Deere Ltd. and Deere & Co. v. Sperry Corporation* (1985) 754 F.2d 132, 135, Judge Garth, giving the judgment of the United States Court of Appeals for the Third Circuit, said:

    "As a co-operative measure, section 1782 cannot be said to ignore those considerations of comity and sovereignty that pervade international law. A grant of discovery that trenched upon the clearly established procedures of a foreign tribunal would not be within section 1782."

C

    My Lords, it was contended for South Carolina, on the basis of these authorities, that the re-re-insurers' application to the district court of the United States was bound to fail. The ground relied on was that, since the procedure of the High Court in England did not enable parties to an action to compel pre-trial discovery against persons not parties to it, the district court would not permit the re-re-insurers to circumvent that limitation by granting them an order for such discovery under section 1782.

D

    It appears to me that there may well be considerable force in this contention. It is not possible, however, for your Lordships, on the limited material before you, to decide for yourselves in advance how the United States district court would see fit to exercise the discretion conferred on it by section 1782, in the particular circumstances of this case, and having regard to the characteristics of civil procedure in the High Court in England which I endeavoured to summarise earlier.

E

    The third matter to which attention needs to be drawn concerns certain changes in the positions of the parties which have occurred since the original hearing of South Carolina's two summonses before Hobhouse J. The first change of position relates to the memorandum lodged in support of the re-re-insurers' application to the United States district court, in which they asserted:

F

    "As evidenced by the attached affidavit of Francis Otley Mackie the petitioners herein are seeking this court's assistance in obtaining information and documentation which is necessary, material and relevant to litigation pending in the courts of England for use in those proceedings. The affidavit further establishes that were all the parties residents of England, the requested discovery would be permitted pursuant to the rules of procedure and discovery in England. Accordingly, the petitioners' motion for taking of testimony and the production of documents should be granted."

G

H     Mr. Mackie, whose affidavit is referred to at the beginning of the above passage, is a partner in the firm of solicitors acting for the re-re-insurers in the two actions in England. The relevant part of that affidavit is paragraph 12, in which Mr. Mackie deposed, inter alia, as follows:

38

Lord Brandon
of Oakbrook        South Carolina Co. v. Assurantie N.V. (H.L.(E.))        [1987]

A

"Discovery of such documentation and testimony is permitted according to the English rules of procedure . . . . Petitioners would be able to obtain writs of subpoena duces tecum issued by the High Court of England . . . directing these entities to produce the documents requested and directing them individually to appear and give testimony at depositions."

B

These statements in the re-re-insurers' memorandum and Mr. Mackie's affidavit were criticised by Hobhouse J. and by Griffiths L.J. in the Court of Appeal as giving such an incomplete and inaccurate account of the procedure of the High Court in England with regard to discovery as seriously to mislead the United States district court. Griffiths L.J., however, expressly acquitted Mr. Mackie of any deliberate intention to mislead. Before your Lordships Mr. Robert Alexander, who appeared as leading counsel for the appellant re-re-insurers, accepted unreservedly that the passages in question were incomplete and inaccurate, and as a consequence liable to mislead. The main error, as will be apparent, is the failure to distinguish clearly between compelling a person not a party to an action to give pre-trial discovery on the one hand, and compelling him to give oral evidence and produce documents at the trial itself on the other hand. I think that it is right for your Lordships to say that the criticisms of that error made by the two courts below were fully justified and that it is most unfortunate that it should ever have occurred. That said, however, having regard to the admission of such error freely made by Mr. Alexander for the re-re-insurers, and having regard further to the summary which I endeavoured to give earlier of the relevant procedure of the High Court in England, it seems to me that the error is no longer of significance in the consideration of this appeal.

C

D

E

The second change of position concerns the scope of the re-re-insurers' application to the United States district court. As I indicated earlier, that application as originally framed covered two distinct matters: first, the production and inspection of specified classes of documents; and, secondly, the appearance of three named persons from P.G.A. and Campbell-Husted to give testimony by depositions. On the face of the motion it appeared that what the re-re-insurers were seeking in relation to the second of these matters was the taking of oral evidence from the persons named relevant to the issues in the English actions, such evidence to be recorded in depositions. Before the Court of Appeal, however, Mr. Sumption for the re-re-insurers expressly abandoned any intention to achieve this end, and before your Lordships Mr. Alexander made it clear that the appearance of the named persons was only sought for the purpose of their producing and identifying the relevant documents held by P.G.A. and Campbell-Husted, and in no way for the purpose of their giving oral evidence to be recorded in depositions with regard to issues of fact arising in the English actions.

F

G

The third change of position arises from the stage which the two actions in England have now reached. At the time when South Carolina's applications first came before Hobhouse J. the re-re-insurers had not yet served their points of defence and counterclaim, so that the issues between the parties had not yet been defined by pleadings and no

H

39

| 1 A.C. | South Carolina Co. v. Assurantie N.V. (H.L.(E.)) | Lord Brandon of Oakbrook |

**A**  discovery of documents as between the parties had yet taken place. Hobhouse J. regarded this as a significant matter in exercising the discretion to grant injunctions which he held that he had. During the hearing before the Court of Appeal, however, the re-re-insurers served points of defence and counterclaim, and since then discovery of documents as between the parties has taken place. The actions in England are, therefore, much further advanced than they were when
**B**  South Carolina's applications first came before the judge.

The fourth change of position is this. Following the decision of the Court of Appeal South Carolina arranged for the re-re-insurers to have controlled access to certain documents held by P.G.A. and Campbell-Husted. According to the re-re-insurers, however, substantial restrictions were imposed by South Carolina on the documents which they were
**C**  allowed to inspect under this arrangement. It is the re-re-insurers' case, therefore, that their application to the United States district court remains necessary in order to enable them to have inspection of other documents to which, by reason of the control exercised by South Carolina, they have not so far had access. Your Lordships were not asked to go into the details of these matters, which are in dispute between the parties, and it is right, I think, for the purposes of this
**D**  appeal for your Lordships to proceed on the basis that the re-re-insurers have at least an arguable case with regard to them.

The fifth and final matter to which attention should be drawn is that the judge of the United States district court before whom the re-re-insurers' application under section 1782 is pending has helpfully directed that further proceedings in that application should be stayed until the determination first of the re-re-insurers' appeal to the Court of Appeal,
**E**  and then of their further appeal to your Lordships' House.

My Lords, having drawn attention to these various preliminary matters, I turn to consider whether the injunctions granted by Hobhouse J. and affirmed by the Court of Appeal should be allowed to stand. I put the question in that form because of the various ways described by me above in which the positions of the parties have
**F**  changed since the original hearing before Hobhouse J.

As appears from the passages from the judgments of Hobhouse J. and Griffiths L.J. which I set out earlier, both courts below treated South Carolina's applications for injunctions as raising matters of principle for decision. I have no doubt that they were right so to treat them. Putting the point differently, the question which your Lordships
**G**  have to decide is whether the circumstances of the case are such as to give the court power to grant the injunctions at all, and not whether, there being such power, it was a proper exercise of discretion to grant them rather than to refuse them.

In considering the question which I have formulated, it will be helpful in the first place to state certain basic principles governing the grant of injunctions by the High Court. The first basic principle is that
**H**  the power of the High Court to grant injunctions is a statutory power conferred on it by section 37(1) of the Supreme Court Act 1981, which provides that "the High Court may by order (whether interlocutory or final) grant an injunction in all cases in which it appears to the court to

40

Lord Brandon
of Oakbrook                South Carolina Co. v. Assurantie N.V. (H.L.(E.))              [1987]

be just and convenient to do so." That provision is similar to earlier    A
provisions of which it is the successor, namely, section 45(1) of the
Supreme Court of Judicature (Consolidation) Act 1925 and section 25(8)
of the Supreme Court of Judicature Act 1873. The second basic principle
is that, although the terms of section 37(1) of the Act of 1981 and its
predecessors are very wide, the power conferred by them has been
circumscribed by judicial authority dating back many years. The nature
of the limitations to which the power is subject has been considered in a    B
number of recent cases in your Lordships' House: *Siskina (Owners of
cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979]
A.C. 210; *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; and
*British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58. The effect
of these authorities, so far as material to the present case, can be
summarised by saying that the power of the High Court to grant    C
injunctions is, subject to two exceptions to which I shall refer shortly,
limited to two situations. Situation (1) is when one party to an action
can show that the other party has either invaded, or threatens to invade,
a legal or equitable right of the former for the enforcement of which the
latter is amenable to the jurisdiction of the court. Situation (2) is where
one party to an action has behaved, or threatens to behave, in a manner
which is unconscionable. The third basic principle is that, among the    D
forms of injunction which the High Court has power to grant, is an
injunction granted to one party to an action to restrain the other party
to it from beginning, or if he has begun from continuing, proceedings
against the former in a foreign court. Such jurisdiction is, however, to
be exercised with caution because it involves indirect interference with
the process of the foreign court concerned.    E

     The latter form of injunction may be granted in such circumstances
as to constitute an exception to the second basic principle stated above.
This may occur where one party has brought proceedings against another
party in a foreign court which is not the forum conveniens for the trial
of the dispute between them, as that expression was defined and applied
in *MacShannon v. Rockware Glass Ltd.* [1978] A.C. 795. In such a case
the party who has brought the proceedings in the foreign court may not,    F
by doing so, have invaded any legal or equitable right of the other
party, nor acted in an unconscionable manner. The court nevertheless
has power to restrain him from continuing his foreign proceedings on
the ground that there is another forum in which it is more appropriate,
in the interests of justice, that the dispute between the parties should be
tried. The present case, however, is not concerned with a choice    G
between two competing forums for the trial of a dispute, and the
exception to which I have just referred is therefore not relevant to it.

     The power of the court to grant *Mareva* injunctions may also, before
it was statutorily recognised, have been a further exception to the
second basic principle stated above. That power, however, has now
been expressly recognised by section 37(3) of the Supreme Court Act
1981, and again the present case is in no way concerned with it.    H

     Ignoring these exceptions, therefore, and applying the basic principles
which I have stated to the present case, the first question for
consideration is whether South Carolina has shown that what I have

41

1 A.C.              South Carolina Co. v. Assurantie N.V. (H.L.(E.))              Lord Brandon
                                                                                 of Oakbrook

A   described above as situation (1) exists. Has South Carolina shown that
    the re-re-insurers, by beginning and intending to prosecute their
    application to the United States district court, has invaded, or threatened
    to invade, a legal or equitable right of South Carolina for the
    enforcement of which the re-re-insurers are amenable to the jurisdiction
    of the court? It was contended by Mr. Rokison on behalf of South
    Carolina that South Carolina did indeed have such a legal or equitable
B   right, but it appeared to me that he had great difficulty in formulating
    the legal or equitable right on which he relied. Neither of the courts
    below decided as they did on the basis that the re-re-insurers had by
    their conduct invaded a legal or equitable right of South Carolina, and I
    cannot see how such a case can be made out. I would therefore hold
    that South Carolina has not shown that situation (1) exists.

C       The second question for consideration is whether South Carolina has
    shown that what I have described above as situation (2) exists. Has
    South Carolina shown that the re-re-insurers, by beginning and intending
    to prosecute their application to the United States district court, have
    acted in a manner which is unconscionable? It is difficult, and would
    probably be unwise, to seek to define the expression "unconscionable
    conduct" in anything like an exhaustive manner. In my opinion, however,
D   it includes, at any rate, conduct which is oppressive or vexatious or
    which interferes with the due process of the court.
        Although neither Hobhouse J. at first instance, nor Griffiths L.J. in
    the Court of Appeal, stated in terms that they thought it right to grant
    injunctions on the ground that the conduct of the re-re-insurers in
    making their application to the United States district court was
E   unconscionable, it seems to me to be implicit in their reasons that they
    regarded it as being so. Hobhouse J. based his decision expressly on the
    need for the court to retain control of its own process, with the
    necessary implication that the re-re-insurers' conduct was an interference
    with such control and therefore an interference with the due process of
    the court. Griffiths L.J. based his decision on three grounds: first (like
    Hobhouse J.), that the court must retain control of its own process;
F   secondly, that the civil procedure of United States courts is significantly
    different from that of English courts, and the parties, by submitting to
    the jurisdiction of an English court, must be taken to have accepted its
    procedure; and, thirdly, that unrestricted access to foreign procedural
    remedies was liable to produce hardship in the form of increased costs
    and inconvenience. I shall consider each of these grounds in turn.

G       I consider, first, the ground that the re-re-insurers' conduct was an
    interference with the court's control of its own process. It is not clear to
    me why this should be so. Under the civil procedure of the High Court
    the court does not, in general, exercise any control over the manner in
    which a party obtains the evidence which he needs to support his case.
    The court may give him help, certainly; for instance by discovery of
    documents inter partes under R.S.C., Ord. 24; by allowing evidence to
H   be obtained or presented at the trial in various ways under Orders 38
    and 39; and by the issue of subpoenas under Part II of Order 38, to
    which I referred earlier. Subject, however, to the help of the court in
    these various ways, the basic principle underlying the preparation and

42

Lord Brandon
of Oakbrook                    South Carolina Co. v. Assurantie N.V. (H.L.(E.))                    [1987]

presentation of a party's case in the High Court in England is that it is    A
for that party to obtain and present the evidence which he needs by his
own means, provided always that such evidence are lawful in the country
in which they are used. It was not in dispute that, if P.G.A. and
Campbell-Husted, uninfluenced by the control exercised over them by
South Carolina on the advice of the latter's English solicitors, had freely
and voluntarily allowed the re-re-insurers to inspect, and where necessary
to copy, all the documents referred to in the latter's application, it could    B
not possibly have been said that there had been any interference with
the English court's control of its own process. That being so, I cannot
see why, since the Federal law of the United States authorises an
application of the kind made by the re-re-insurers in this case, the
making of such application, which may or may not succeed in whole or
in part, should be regarded as being such an interference either. I    C
cannot, therefore, agree with the first ground of decision relied on by
the Court of Appeal.

I consider, secondly, the ground that the procedure of United States
courts is significantly different from that of English courts, and the
parties, by submitting to the jurisdiction of an English court, must be
taken to have accepted its procedure. It is, no doubt, true that the re-re-
insurers, by entering unconditional appearances in the two English    D
actions, can be said in a certain sense to have accepted the procedure of
that court. Your Lordships were not, however, informed of any ground
on which the re-re-insurers could, with any prospect of success, have
contested the jurisdiction of the High Court in England in respect of the
disputes which are the subject matter of the two actions concerned. Be
that as it may, I cannot see that the re-re-insurers, by seeking to    E
exercise a right potentially available to them under the Federal law of
the United States, have in any way departed from, or interfered with,
the procedure of the English court. All they have done is what any party
preparing his case in the High Court here is entitled to do, namely to try
to obtain in a foreign country, by means lawful in that country,
documentary evidence which they believe that they need in order to
prepare and present their case. It was said that the re-re-insurers could    F
have applied to the High Court under R.S.C., Ord. 39, r. 2, for letters
of request to issue to the proper judicial authorities in the United States.
But 28 United States Code, section 1782, allows an application to be
made either indirectly by the foreign court concerned or directly by an
interested party, and I can see no good reason why the re-re-insurers
should not have chosen whichever of these two alternatives they    G
preferred. It is, I think, of the utmost importance to appreciate that the
reason why English procedure does not permit pre-trial discovery of
documents against persons who are not parties to an action is for the
protection of those third parties, and not for the protection of either of
the persons who are parties to the action. I cannot, therefore, agree
with the second ground of decision relied on by the Court of Appeal.

I consider, thirdly, the ground that unrestrained access to foreign    H
procedural remedies was liable to cause hardship in the form of increased
costs and inconvenience. So far as increased costs are concerned,
Griffiths L.J. was referring to increased costs incurred or to be incurred

43

**1 A.C.**               **South Carolina Co. v. Assurantie N.V. (H.L.(E.))**               Lord Brandon
of Oakbrook

A    by South Carolina in contesting the proceedings in the United States district court. If, however, the re-re-insurers are right in their contention that they have not yet, by reason of the control exercised by South Carolina, had access to all the documents to which they believe that they need access in order to prepare their case in the two English actions, it can reasonably be said that any liability for increased costs incurred by South Carolina is in a sense self-imposed. If they had been

B    willing to permit P.G.A. and Campbell-Husted to allow the re-re-insurers to inspect, and where necessary copy, all the documents to which the latter had sought access, the making or prosecution of the re-re-insurers' application to the United States district court would not have been necessary. In this connection it is right to stress what I have already stated earlier, that P.G.A. and Campbell-Husted, left to

C    themselves, would voluntarily have given the re-re-insurers permission to inspect, and where necessary copy, all the documents to which the latter sought access. It was said for South Carolina that the documents not so far disclosed were not relevant to the issues in the two English actions. If that is so, I cannot help asking myself why South Carolina has gone to such lengths to prevent the disclosure of such documents. So far as inconvenience is concerned, it is apparent that Griffiths L.J. had two

D    kinds of inconvenience in mind: first inconvenience in relation to the two actions immediately concerned in the form of delay in getting them tried and possible prolongation of the trial when it took place; and, secondly, inconvenience to other litigants by reason of the consequent dislocation of the time-table for the trial of other cases in the congested list of the Commercial Court. So far as delay is concerned, it is perhaps

E    ironical that the only result of South Carolina seeking to obtain injunctions against the re-re-insurers has been to increase greatly whatever delay the re-re-insurers' application, if allowed to proceed unopposed, might otherwise have caused. I recognise that the re-re-insurers' application may result in some increased costs to South Carolina, but these could, as I indicated earlier, have easily been avoided by a different attitude on South Carolina's part. I recognise also

F    that some inconvenience of the two kinds to which I have referred may arise from the re-re-insurers' application; but, if there is a reasonable possibility that such inconvenience is the price of justice being fully done at the trial of the two English actions, then it seems to me to be a price which must necessarily be paid. In any event, I cannot see how the re-re-insurers' application, made in what may prove to be a just cause, can,

G    solely on the ground that it occasions the extra costs and inconvenience under discussion, be categorised as an interference with the court's control of its own process. The court can control any excessive delay by fixing such date for the trial of the two actions as may be just, and nothing which the re-re-insurers can do can take away or interfere with the court's control in this respect. As to increased costs these will, no doubt, be a matter for the consideration of the Commercial judge at the

H    conclusion of the trial, and I do not think it would be right for your Lordships to express any views, one way or the other, about such matter. For these reasons I cannot agree with the third ground of decision relied on by the Court of Appeal.

44

Lord Brandon
of Oakbrook                   South Carolina Co. v. Assurantie N.V. (H.L.(E.))                   [1987]

My Lords, the result of the views which I have expressed is that     A
there was, in my opinion, no such interference with the procedure of the
English High Court by the re-re-insurers as would amount to
unconscionable conduct on their part, and so justify, in accordance with
the basic principles which I stated earlier, the exercise of the court's
power to grant injunctions against them. It follows that I would allow
the appeal and set aside the orders of Hobhouse J. dated 25 April 1985
and of the Court of Appeal dated 23 May 1985. As regards costs in your     B
Lordships' House, I have no doubt that South Carolina should pay the
costs of the re-re-insurers. As regards costs in the two courts below,
different considerations may apply, first, because of the breadth of the
re-re-insurers' application to the United States district court as originally
framed, and, secondly, because of the misleading nature, in the respect
to which I referred earlier, of the memorandum and affidavit lodged in     C
support of such application. I therefore think it desirable that, in
relation to those costs, your Lordships should have the assistance of
further argument from counsel on either side.

LORD BRIGHTMAN. My Lords, in this appeal I respectfully differ from
the conclusion reached by the Court of Appeal. I have had the privilege
of studying in advance the speech of my noble and learned friend, Lord     D
Brandon of Oakbrook, and I find myself wholly convinced by his
reasons for moving that this appeal should be allowed. I agree with the
orders that he proposes should be made.

LORD MACKAY OF CLASHFERN. My Lords, I have had the advantage
of reading in draft the speeches prepared by my noble and learned     E
friends, Lord Brandon of Oakbrook and Lord Goff of Chieveley. I
agree that it would be wise to make the reservation on the matter to
which Lord Goff of Chieveley has drawn attention but, like him, I agree
with the conclusion reached by Lord Brandon of Oakbrook and with the
reasons he has given for reaching that conclusion.

LORD GOFF OF CHIEVELEY. My Lords, I find myself to be in respectful     F
agreement with the conclusion reached by my noble and learned friend,
Lord Brandon of Oakbrook, on this appeal, and with the reasons given
by him for reaching that conclusion. I wish, however, to draw attention
to one matter upon which I have certain reservations, and to which I
attach importance.

I am reluctant to accept the proposition that the power of the court     G
to grant injunctions is restricted to certain exclusive categories. That
power is unfettered by statute; and it is impossible for us now to foresee
every circumstance in which it may be thought right to make the remedy
available. In particular, I do not regard the exercise of the power to
restrain a person from commencing or continuing proceedings in a
foreign forum as constituting an exception to certain limited categories
of case in which it has been said that the power may alone be exercised.     H
In my opinion, restraint of proceedings in a foreign forum simply
provides one example of circumstances in which, in the interests of
justice, the power to grant an injunction may be exercised. I have

45

**1 A.C.**            South Carolina Co. v. Assurantie N.V. (H.L.(E.))            Lord Goff
of Chieveley

A   elsewhere explained in detail, for reasons which it is unnecessary for me
to repeat in the present case, why, on the basis of a line of established
authority, I am at present inclined to the opinion that an injunction has
generally been granted in such circumstances for the purpose of
protecting the English jurisdiction, and why I doubt, with all respect,
whether the speech of my noble and learned friend, Lord Scarman, in
*Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, contains the
B   last word on the subject. I refer, in this connection, to my judgment in
*Bank of Tokyo Ltd. v. Karoon* (Note) [1987] A.C. 45.

Even so, I can see no basis for the grant of an injunction in the
present case. In particular, in agreement with my noble and learned
friend Lord Brandon of Oakbrook, and respectfully differing from
Hobhouse J. and the Court of Appeal, I do not consider that the grant
C   of the injunction can be justified as necessary to protect the English
jurisdiction on the facts of the present case. In this, I find myself
entirely in agreement with the reasons expressed in the speech of my
noble and learned friend, Lord Brandon of Oakbrook. I therefore agree
that the appeal should be allowed.

*Appeal allowed with costs.*

D

*Solicitors: Clyde & Co.; Herbert Smith & Co.*

J. A. G.

E

———

NOTE

F

[COURT OF APPEAL]

BANK OF TOKYO LTD. v. KAROON AND ANOTHER

1984   April 3, 4, 5;                    Ackner and Robert Goff L.JJ.
May 24

G

*Injunction—Jurisdiction to grant—Foreign proceedings—Interpleader
proceedings to determine ownership of money held by bank in
England—Bank's subsidiary in New York providing information
concerning claimant and his accounts—Claimant bringing pro-
ceedings in New York against subsidiary—Whether bank entitled
to injunction to restrain proceedings in New York*

H

APPEAL from Bingham J.

In 1983 Mr. Majid Karoon started proceedings in New York against the
Bank of Tokyo Ltd., a Japanese bank carrying on business in London, and also
against a wholly-owned subsidiary of that bank, the Bank of Tokyo Trust Co.

# EXHIBIT B



# Equasis - Ship folder
# FRATZESCOS
*imo: 9171266*

## • Disclaimers

Neither Equasis nor its officers or employees shall be under any liability or responsibility whatsoever regarding the data displayed on this site, including hyperlinks or printing. Whist Equasis will make every effort to provide accurate information, it does not rule out the possibility of inadvertent omissions or inaccuracies.

Neither Equasis nor its officers or employees accept any responsibility and shall not be liable for any loss to any person caused by or arising from any information displayed on this site.

Only factual information is displayed in Equasis. Information does not undergo any changes by Equasis. Special attention has been paid to the accuracy of the data. Data is regularly updated in order to help ensure that information remains as reliable as possible. The frequency of updates varies from provider to provider.

No part of the information contained in or from the Equasis website may be stored in a retrieval system, or transmitted in any form, or by any means without prior permission in writing from Equasis.

The following actions are forbidden:
- Bulk-downloading of data contained on the site ;
- Use of downloaded data for financial gain ;
- Use of a robot or similar remote device to download large batches of data.

The above list is not exhaustive, and it should be noted that Equasis continually monitors the activity on its website and if misuse is detected, then the user's account can be locked without prior notice.

# Ship informations

## • Ship particulars

| | Information | Since |
|---|---|---|
| IMO number : | 9171266 | |
| Name of ship : | FRATZESCOS | (since 01/11/2011) |
| Call sign : | D5AV2 | |
| MMSI : | 636015453 | |
| Gross tonnage : | 38972 | (during 1999) |
| DWT : | 73127 | |
| Type of ship : | Bulk Carrier | (during 1999) |
| Year of build : | 1999 | |
| Flag : | Liberia | (since 01/11/2011) |
| Status of ship : | In Service/Commission | (since 30/06/1999) |
| Last update : | 09/12/2014 | |



EXHIBIT
B

## • Management detail

| IMO | Role | Name of company | Address | Date of effect |
|---|---|---|---|---|
| 1929354 | ISM Manager | RAINBOW SHIPMANAGEMENT SA | 274, Dimitriou Gounari & Prigkipos Petrou Streets, Glyfada, 166 74 Athens, Greece. | since 06/11/2011 |
| 1929354 | Ship manager | RAINBOW SHIPMANAGEMENT SA | 274, Dimitriou Gounari & Prigkipos Petrou Streets, Glyfada, 166 74 Athens, Greece. | since 04/11/2011 |
| 5638346 | Registered owner | CENTURY SHIPPING & TRADING CO | Care of Rainbow Shipmanagement SA , 42, Poseidonos Avenue, Palaio Faliro, 175 61 Athens, Greece. | since 04/11/2011 |

## • Classification surveys

| Classification society | Date survey | Date next survey |
|---|---|---|
| Det Norske Veritas | 07/07/2014 | 30/06/2019 |

## • P&I information

| Name of P&I insurer | Recorded on |
|---|---|
| Assuranceforeningen Gard - Norway | 02/02/2015 |

# Ship inspections

## • List of port state control

| PSC organisation | Authority | Port of inspection | Date of report | Detention | Duration (days) | Number of deficiencies |
|---|---|---|---|---|---|---|
| Mediterranean MoU | Turkey | Aliaga | 17/11/2014 | N | 0 | |
| Vina Del Mar MoU | Argentina | ARROYO SECO | 03/10/2014 | N | 0 | 1 |
| Vina Del Mar MoU | Argentina | ARROYO SECO | 01/10/2014 | N | 0 | 8 |
| Vina Del Mar MoU | Argentina | ARROYO SECO | 29/09/2014 | Y | 1 | 9 |
| Tokyo MoU | Australia | Geelong | 22/01/2014 | | | |
| Indian Ocean MoU | Australia | Geelong | 20/01/2014 | Y | | 10 |
| Tokyo MoU | Australia | Geelong | 20/01/2014 | | | |
| Tokyo MoU | Indonesia | Banten | 20/12/2013 | | | |
| Vina Del Mar MoU | Argentina | SAN LORENZO | 06/11/2013 | N | 0 | 2 |
| Vina Del Mar MoU | Brazil | SANTOS SP | 13/08/2013 | N | 0 | 4 |
| Vina Del Mar MoU | Argentina | LA PLATA | 07/08/2013 | N | 0 | 5 |
| Tokyo MoU | China Peoples's Republic | Tianjin | 28/05/2013 | | | |
| Tokyo MoU | | | 06/08/2012 | | | |
| Tokyo MoU | | | 27/07/2012 | | | |
| US Coast Guard | United States of America | New Orleans, Louisiana | 07/02/2012 | N | 0 | |
| US Coast Guard | United States of America | New Orleans, Louisiana | 25/01/2012 | N | 0 | 1 |
| Tokyo MoU | | | 23/11/2011 | | | |
| Indian Ocean MoU | Australia | Hay Point | 23/11/2011 | N | 0 | 2 |
| Tokyo MoU | | | 10/10/2011 | | | |
| Indian Ocean MoU | Australia | Newcastle | 13/10/2010 | N | 0 | |
| Tokyo MoU | | | 13/10/2010 | | | |
| Tokyo MoU | | | 23/01/2010 | | | |
| Indian Ocean MoU | Australia | Hay Point | 22/01/2010 | N | 0 | 1 |
| US Coast Guard | United States of America | New Orleans, Louisiana | 11/05/2009 | N | 0 | |
| Paris MoU | Spain | Ferrol | 02/12/2008 | N | 0 | 5 |
| Tokyo MoU | | | 19/09/2008 | | | |
| Tokyo MoU | | | 12/06/2008 | | | |

## • List of port state control

| PSC organisation | Authority | Port of inspection | Date of report | Detention | Duration (days) | Number of deficiencies |
|---|---|---|---|---|---|---|
| US Coast Guard | United States of America | Seattle, Washington | 11/05/2008 | N | 0 | |
| Tokyo MoU | | | 06/11/2007 | | | |
| Indian Ocean MoU | Australia | Gladstone | 05/11/2007 | Y | 1 | 5 |
| Indian Ocean MoU | Australia | Newcastle | 31/08/2006 | N | 0 | 3 |
| Indian Ocean MoU | Australia | Newcastle | 17/11/2005 | N | 0 | 1 |
| Indian Ocean MoU | Australia | Newcastle | 25/02/2005 | N | 0 | 14 |
| Indian Ocean MoU | Australia | Newcastle | 09/08/2004 | N | 0 | 3 |
| Tokyo MoU | | | 16/07/2004 | | | |
| Tokyo MoU | | | 16/10/2003 | | | |
| Paris MoU | Canada | Port hawkesbury | 15/01/2003 | N | 0 | 3 |
| Paris MoU | Sweden | Oxelosund | 27/09/2001 | N | 0 | 2 |
| Tokyo MoU | Australia | Gladstone | 29/06/2001 | | | |
| US Coast Guard | United States of America | MSO New Orleans | 14/02/2001 | N | 0 | |
| Paris MoU | Spain | Valencia | 25/10/2000 | N | 0 | 2 |
| Paris MoU | Spain | Valencia | 12/09/2000 | N | 0 | 2 |
| Paris MoU | Italy | Piombino | 09/03/2000 | N | 0 | |
| US Coast Guard | United States of America | MSSO Port Lavaca | 20/12/1999 | N | 0 | |
| US Coast Guard | United States of America | MSO New Orleans | 12/10/1999 | N | 0 | |
| Paris MoU | Sweden | Oxelosund | 10/09/1999 | N | 0 | 2 |

## • Human element deficiencies

| PSC organisation | Authority | Port of inspection | Date of report | Human element deficiencies |
|---|---|---|---|---|
| Indian Ocean MoU | Australia | Hay Point | 23/11/2011 | 1 |
| Paris MoU | Spain | Ferrol | 02/12/2008 | 1 |
| Indian Ocean MoU | Australia | Newcastle | 31/08/2006 | 1 |
| Paris MoU | Canada | Port hawkesbury | 15/01/2003 | 1 |

# Ship history

## • Current and former name(s)

| Name of ship | Date of effect | Source |
|---|---|---|
| FRATZESCOS | since 01/11/2011 | IHS Maritime |

## • Current and former flag(s)

| Flag | Date of effect | Source |
|---|---|---|
| Liberia | since 01/11/2011 | IHS Maritime |

## • Current and former classification status

| Classification society | Date of survey | Sources |
|---|---|---|
| Det Norske Veritas | 07/07/2014 | Det Norske Veritas |
| Det Norske Veritas | 08/07/2009 | Det Norske Veritas |
| Det Norske Veritas | 26/06/2004 | Det Norske Veritas |

## • Company

| Company | Role | Date of effect | Sources |
|---|---|---|---|
| RAINBOW SHIPMANAGEMENT SA | ISM Manager | since 06/11/2011 | IHS Maritime |
| RAINBOW SHIPMANAGEMENT SA | Ship manager | since 04/11/2011 | IHS Maritime |
| CENTURY SHIPPING & TRADING CO | Registered owner | since 04/11/2011 | IHS Maritime |

# EXHIBIT C

| 1. Shipbroker | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE<br>UNIFORM GENERAL CHARTER (AS REVISED 1922 and 1976)<br>INCLUDING "F.I.O." ALTERNATIVE, ETC.<br>(to be used for trades for which no approved form is in force)<br>CODE NAME: " GENCON"      Part 1 |
|---|---|
| | 2. Place and date<br><br>*Lugano 4th November 2014* |
| 3. Owners/ Place of Business (Cl.1)<br><br>*Messers NOVAMARINE CARRIERS S.A*<br>*VIA G.BAGUTTI 5*<br>*6900 LUGANO*<br>*SWITZERLAND* | 4. Charterers/ Place of business (Cl.1)<br><br>*Messers  NOVEXCO ( CYPRUS ) LIMITED*<br>*1,DEMOPONTOS STR., OFFICE 501,*<br>*1075 NICOLOSIA,*<br>*CYPRUS* |
| 5. Vessel's name (Cl.1)<br><br>*(See also Clause 18)* | 6. GRT/ NRT (Cl.1) |
| 7. Deadweight cargo carrying capacity in tons (abt.) (Cl.1) | 8. Present position (Cl.1)<br>*Trading* |
| 9. Expected ready to load (abt.) (Cl.1)<br><br>*See Clause 24* | |
| 10. Loading port or place (Cl.1)<br><br>*(One) 1/2 (Two) safe berth(s) TUAPSE OR NOVOROSSYSK, if one shifting is necessary to be for Vessel's/Owners' account.*<br>*Owners to satisfy themselves about prevailing restrictions all ends* | 11. Discharging port or place (Cl.1)<br><br>*One (1) safe berth, PHILADELPHIA ,*<br>*Kinder Morgan terminal or Holt Terminal in Charterers Option* |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state " part cargo" ) (Cl.1)<br><br>*2 (Two )firm cargoes  minimum 51.500 MT if loading port is Novorossysk, 52,500  MT if loading port is Tuapse,  up to  55,000 MT steel slabs in Charterers 'option,*<br>*Slab unit weight minimum  16 metric tons and maximum 33 metric tons.* ||
| 13. Freight rate (also state if payable on delivered or intaken quantity) (Cl.1)<br><br>*See Clause 25* | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl.4)<br><br>*See Clause 40* |
| 15. Loading and discharging costs (state alternative (a) or (b) of Cl.5; also indicate if vessel is gearless) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch. , fill in c) only) (Cl.6)<br><br>a) Laytime for loading<br><br>*See Clause 22* |
| 17. Shippers (state name and address) (Cl. 6) | b) Laytime for discharging<br><br>*See Clause 22* |
| | c) Total laytime for loading and discharging<br><br>*See Clause 22* |
| 18. Demurrage rate (loading and discharging) (Cl.7)<br>*Demurrage rate to be*<br>*See  Clause 31* | 19. Laydays /Cancelling date (Cl.10):<br><br>*See Clause 24* |
| 20. Brokerage commission and to whom payable (Cl.14) ||
| 21. Additional clauses covering special provisions, if agreed.<br><br>*RIDER CLAUSES 18 – 55  ARE DEEMED TO BE INCORPORATED HEREIN IN THIS CHARTER PARTY* ||

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| Nova Marine Carriers SA<br>Via Bagutti s<br>6900 Lugano - Switzerland | |

EXHIBIT

C

PART II
" Gencon" Charter (As Revised 1922 and 1976)
Including "F.I.O." Alternative, etc.

**1.** It is agreed between the party mentioned in Box 3 as Owners of the
steamer-or-motor-vessel-named-in-Box-6-of-the-gross/-net-Register 1
tons,-indicated-in-Box-6-and-carrying-about-the-number-of-tons-of 2
deadweight-cargo-stated-in-Box-7,-now-in-position-as-stated-in-Box-8 3
and-expected-ready-to-load-under-this-Charter-about-the-date-in- 4
dicated-in-Box-9, and the party mentioned as Charterers in Box 4 5
that: 6
The said vessel shall proceed to the loading port or place stated 7
in Box 10 or-so-near-thereto-as-she-may-safely-get and lie always 8
afloat, and there load a full-and-complete-cargo ( if-shipment-of-deck 9
cargo-agreed-same-to-be-at-Charterers'-risk-)-as stated in Box 12 10
(Charterers to provide all mats and/or wood for dunnage and any 11
separations required, the Owners allowing the use of any dunnage 12
wood on board if required ) which the Charterers bind themselves to 13
ship, and being so loaded the vessel shall proceed to the discharg- 14
ing port or place stated in Box 11 as-ordered-on-signing-Bills-of 15
Lading-or-so-near-thereto-as-she-may-safely-get and lie always 16
afloat and there deliver the cargo on-being-paid-freight-on-delivered 17
or-intaken-quantity-as-indicated-in-Box-13-at-the-rate-stated-in 18
Box-13. 19
20

**2. Owners' Responsibility Clause** 21
Owners are to be responsible for loss or damage to the goods 22
or for delay in delivery of the goods only in case the loss, damage 23
or delay has been caused by the improper or negligent stowage of the 24
goods (unless-stowage-performed-by-shippers/Charterers-or-their 25
stevedores-or-servants)-or by personal want of due diligence on the 26
part of the Owners or their Manager to make the vessel in all respects 27
seaworthy and to secure that she is properly manned, equipped and 28
supplied or by the personal act or default of the Owners or their 29
Manager. 30
And the Owners are-responsible-for-no-loss-or-damage-or-delay 31
arising-from-any-other-cause-whatsoever,-even-from-the-neglect-or 32
default-of-the-Captain-or-crew-or-some-other-person-employed-by-the 33
Owners-on-board-or-ashore-for-whose-acts-they-would,-but-for-this 34
clause,-be-responsible,-or-from-unseaworthiness-of-the-vessel-on 35
loading-or-commencement-of-the-voyage-or-at-any-time-whatsoever. 36
Damage caused by contact with or leakage, smell or evaporation from 37
other goods or by the inflammable or explosive nature or in- 38
sufficient package of other goods not to be considered as caused 39
by improper or negligent stowage, even if in fact so caused. 40

**3. Deviation Clause** 41
The vessel has liberty to-call-at-any-port-or-ports-in-any-order,-for 42
any-purpose, to sail without pilots, to tow and/or assist vessels in 43
all situations, and also to deviate for the purpose of saving life and/ 44
or property. 45

**4. Payment of Freight** 46
The freight to be paid in accordance with Clause 31 and 16 the-manner 47
prescribed-in-Box-14-in-cash 48
without-discount-on-delivery-of-the-cargo-at-mean-rate-of-exchange 49
ruling-on-day-or-days-of-payment-the-receivers-of-the-cargo-being 50
bound-to-pay-freight-on-account-during-delivery,-if-required-by-Cap- 51
tain-or-Owners. 52
Cash-for-vessel's-ordinary-disbursements-at-port-of-loading-to-be 53
advanced-by-Charterers-if-required-at-highest-current-rate-of-ex- 54
change,-subject-to-two-per-cent,-to-cover-insurance-and-other-ex- 55
penses. 56

**5. Loading/Discharging** 58
(a) Gross Terms 57
The cargo to be brought alongside in such a manner as to enable 59
vessel to take the goods with her own tackle. Charterers to procure 60
and pay the necessary men on shore or on board the lighters to do 61
the work there, vessel only heaving the cargo on board. 62
If the loading takes place by elevator, cargo to be put free in vessel's 63
holds, Owners only paying trimming expenses. 64
Any pieces and/ or packages of cargo over two tons weight, shall be 65
loaded, stowed and discharged by Charterers at their risk and 66
expenses. The cargo to be received by Merchants at their risk and 67
expenses alongside the vessel not beyond the reach of her tackle. 68
(b) F.i.o and free stowed/trimmed 69
The cargo shall be brought into the holds, loaded, stowed and/ or trim- 70
med and taken from the holds and discharged by the Charterers or 71
their Agents, free of any-risk,-liability and expenses whatsoever to the 72
Owners. 73
The-Owners-shall-provide-winches,-motive-power-and-winchmen-from 74
the-Crew-if-requested-and-permitted;-if-not,-the-Charterers-shall 75
provide-and-pay-for-winchmen-from-shore-and-or-cranes,-if-any.-(This 76
provision-shall-not-apply-if-vessel-is-gearless-and-stated-as-such-in 77
Box-15). 78
Indicate-alternative-(a)-or-(b),-as-agreed,-in-Box-15. 

**6. Laytime** *See Clause 34* 79
(a)-Separate-laytime-for-loading-and-discharging 80
The-cargo-shall-be-loaded-within-the-number-of-running-hours-as 81
indicated-in-Box-16,-weather-permitting,-Sundays-and-holidays-ex- 82
cepted,-unless-used,-in-which-event-time-actually-used-shall-count. 83
The-cargo-shall-be-discharged-within-the-number-of-running-hours 84
as-indicated-in-Box-16,-weather-permitting,-Sundays-and-holidays-ex- 85
cepted,-unless-used,-in-which-event-time-actually-used-shall-count. 86
(b)-Total-laytime-for-loading-and-discharging 87
The-cargo-shall-be-loaded-and-discharged-within-the-number-of-total 88
running-hours-as-indicated-in-Box-16,-weather-permitting,-Sundays-and 89
holidays-excepted,-unless-used,-in-which-event-time-actually-used 90
shall-count. 91
(c)-Commencement-of-laytime-(loading-and-discharging) 92
Laytime-for-loading-and-discharging-shall-commence-at-2-p.m.-if 93
Notice-of-readiness-is-given-before-noon,-and-at-6-a.m.-next-working 94
day-if-notice-given-during-office-hours-after-noon.-Notice-at-loading 95
port-to-be-given-to-the-Shippers-named-in-Box-17, 96
Time-actually-used-before-commencement-of-laytime-shall-count. 97

**7. Demurrage** 101
Ten-running-days-on demurrage at the rate stated in Box 18 *In-current* 101
per day or prorata for any part of the day, payable-day-by-day-to-be 102
allowed-Merchants-altogether-at-ports-to-be-settled-as-per-Clause-31-of 103
loading and discharging 104

**8. Lien Clause** 105
Owners shall have a lien on the cargo for freight, dead-freight, 106
demurrage and damages for detention. Charterers shall remain re- 107
sponsible for dead-freight and demurrage ( including damages for 108
detention), incurred at port of loading. Charterers shall also remain 109
responsible for freight and demurrage (-including-damages-for-deten- 110
tion-)-incurred-at-port-of-discharge,-but-only-to-such-extent-as-the 111
Owners-have-been-unable-to-obtain-payment-thereof-by-exercising 112
the-lien-on-the-cargo. 113

**9. Bills of Lading** 114
The Captain to sign Bills of Lading at such rate of freight as 114
presented without prejudice to this Charter party,-but-should-the 115
freight-by-Bills-of-Lading-amount-to-less-than-the-total-chartered-freight 116
the-difference-to-be-paid-to-the-Captain-in-cash-on-signing 117
Bills-of-Lading. 118

**10. Cancelling Clause** 120
Should the vessel not be ready to load ( whether in berth or not ) on 121
or before the date indicated in Box 19, Charterers have the option 122
of cancelling this contract, such option to be declared, if demanded, 123
at least 48 hours before vessel's expected arrival at port of loading. 124
Should-the-vessel-be-delayed-on-account-of-average-or-otherwise, 125
Charterers-to-be-informed-as-soon-as-possible-and-if-the-vessel-is 126
delayed-for-more-than-10-days-after-the-day-she-is-stated-to-be 127
expected-ready-to-load,-Charterers-have-the-option-of-cancelling-this 128
contract,-unless-a-cancelling-date-has-been-agreed-upon. 129

**11. General Average** 130
General Average to be settled according to York-Antwerp Rules 1974, 131
Proprietors of cargo to pay the cargo's share in the general expenses 
even if same have been necessitated through neglect or default of the 132
Owners' servants ( see Clause 2 ). 133

**12. Indemnity** 134
Indemnity for non-performance of this Charter party, proved damages, 
not exceeding estimated amount of freight. 135
136

**13. Agency** – *See Clause 45* 137
In-every-case-the-Owners-shall-appoint-his-own-Broker-or-Agent-both 138
at-the-port-of-loading-and-the-port-of-discharge. 139
140

**14. Brokerage** 141
A brokerage commission at the rate stated in Box 20 on the freight, 142
earned is due to the party mentioned in Box 20. 143
In case of non-execution at least1/3 of the brokerage on the estimated 144
Amount of freight and dead-freight to be paid by the Owners to the 145
Brokers as indemnity for the latter's expenses and work. In case of 146
more voyages the amount of indemnity to be mutually agreed. 147

**15. GENERAL STRIKE CLAUSE** 148
Neither Charterers nor Owners shall be responsible for the con- 149
sequences of any strikes or lockouts preventing or delaying the 150
fulfilment of any obligations under this contract. 151
If there is a strike or lock-out affecting the loading of the cargo, 152
or any part of it, when vessel is ready to proceed from her last port 153
or at any time during the voyage to the port or ports of loading or 154
after her arrival there, Captain or Owners may ask Charterers to 155
declare, that they agree to reckon the laydays as if there were no 156
strike or lock-out. Unless Charterers have given such declaration in 157
writing ( by telegram, if necessary ) within 24 hours, Owners shall 158
have the option of cancelling this contract. If part cargo has already 159
been loaded, Owners must proceed with same, ( freight payable on 160
loaded quantity only) having liberty to complete with other cargo 161
on the way for their own account. 162
If there is a strike or lock-out affecting the discharge of the cargo on or 163
after vessel's arrival at or off port of discharge and same has not been 164
settled within 48 hours, Receivers shall have the option of 165
keeping vessel waiting until such strike or lock-out is at an end 166
against paying half demurrage after expiration of the time provided 167
for discharging, or of ordering the vessel to a safe port where she 168
can safely discharge without risk of being detained by strike or lock- 169
out. Such orders to be given within 48 hours after Captain or Owners 170
have given notice to Charterers of the strike or lock-out affecting 171
the discharge. On delivery of the cargo at such port, all conditions 172
of this Charterparty and of the Bill of Lading shall apply and vessel 173
shall receive the same freight as if she had discharged at the 174
original port of destination, except that if the distance of the sub- 175
stituted port exceeds 100 nautical miles, the freight on the cargo 176
delivered at the substituted port to be increased in proportion. 177

**16.** (* Voymar 1950*)Chamber of Shipping War Risk Clause 16, 2 to 178
apply 
(4)-In-these-clauses-"-War-Risks-"-shall-include-any-blockade-or-any 179
action-which-is-announced-as-a-blockade-by-any-Government-or-by 180
any-belligerent-or-by-any-organised-body,-sabotage,-piracy,-and-any 181
actual-or-threatened-war,-hostilities,-warlike-operations,-civil-war,-civil 182
commotion,-or-revolution. 183
(2)If-at-any-time-before-the-Vessel-commences-loading,-it-appears-that 184
performance-of-the-contract-will-subject-the-Vessel-or-her-Master-and 185
crew-or-her-cargo-to-war-risks-at-any-stage-of-the-adventure,-the 186
Owners-shall-be-entitled-by-letter-or-telegram-despatched-to-the 187
Charterers,-to-cancel-this-Charter. 188
(3)The-Master-shall-not-be-required-to-load-cargo-or-to-continue 189
loading-or-to-proceed-on-or-to-sign-Bill(s)-of-Lading-for-any-adventure 190
on-which-or-any-port-at-which-it-appears-that-the-Vessel,-her-Master 191
and-crew-or-her-cargo-will-be-subjected-to-war-risks.-In-the-event 192
the-exercise-by-the-Master-of-his-right-under-this-Clause-after-part-or 193

**PART II**
" Gencon" Charter (As Revised 1922 and 1976)
Including "F.I.O." Alternative, etc.

Time lost in waiting for berth to count as loading or discharging   88
time, as the case may be   99
Indicate alternative (a) or (b) as agreed, in Box 16.   100

bachwards or forwards, although in a contrary direction to or out of or   199
beyond the ordinary route, in the event of the Master desiring to   200
proceed with such cargo under this Clause freight shall in any case   201
be payable on the quantity delivered.   202
(4) If at the time the Master elects to proceed with part or full cargo   203
under Clause 3, after the Vessel has left the loading port, or those of   204
the loading ports, if more than one, it appears that further   205
performance of the contract will subject the Vessel, her Master and   206
crew or her cargo, to war risks, the cargo shall be discharged, or if   207
the discharge has been commenced shall be completed, at any safe   208
port in vicinity of the port of discharge as may be ordered by the   209
Charterers. If no such orders shall be received from the Charterers   210
within 48 hours after the Owners have dispatched a request by   211
telegram to the Charterers for the nomination of a substitute   212
discharging port, the Owners shall be at liberty to discharge the cargo   213
at any safe port which they may, in their discretion, decide on and such   214
discharge shall be deemed to be due fulfilment of the contract of   215
affreightment. In the event of cargo being discharged at any such   216
other port, the Owners shall be entitled to freight as if the discharge   217
had been effected at the port or ports named in the Bill(s) of Lading or   218
to which the Vessel may have been ordered pursuant thereto.   219

(6) (a) The Vessel shall have liberty to comply with any directions or   220
recommendations as to loading, departure, arrival, routes, ports   221
of call, stoppages, destination, zones, waters, discharge, delivery or   222
in any other way whatsoever ( including any direction or recom-   223
mendation not to go to the port of destination or to delay proceeding   224
thereto or to proceed to some other port) given by any Government or   225
by any belligerent or by any organised body engaged in civil war,   226
hostilities or warlike operations or by any person or body acting or   227
purporting to act as or with the authority of any Government or   228
belligerent or of any such organised body or by any committee or   229
person having under the terms of the war risks insurance on the   230
Vessel, the right to give any such directions or recommendations. If,   231
by reason of or in compliance with any such direction or recom-   232
mendation, anything is done or is not done, such shall not be deemed   233
a deviation.   234

b) If, by reason of or in compliance with any such directions or re-   235
commendation, the Vessel does not proceed to the port or ports   236
named in the Bill(s) of Lading or to which she may have been ordered   237
pursuant thereto, the Vessel may proceed to any port as   238
directed or recommended or to any safe port which the Owners in   239
their discretion may decide on and there discharge the cargo. Such   240
discharge shall be deemed to be due fulfilment of the contract of   241
affreightment and the Owners shall be entitled to freight as if   242
discharge had been effected at the port or ports named in the Bill(s)   243
of Lading or to which the Vessel may have been ordered pursuant   244
thereto.   245

(8) All extra expenses ( including insurance costs) involved in dischar-   246
ging cargo at the loading port or in reaching or discharging the cargo   247
at any port as provided in Clauses 4 & 6 (b) hereof shall be paid   248
by the Charterers and/or cargo owners, and the Owners shall have a   249
lien on the cargo for all moneys due under these Clauses.   260

full cargo has been loaded, the Master shall be at liberty either to   194
discharge such cargo at the loading port or to proceed therewith.   195
In the latter case the Vessel shall have liberty to carry other cargo   196
for Owners' benefit and accordingly to proceed to and load or   197
discharge such cargo at any other port or ports whatsoever.   198
General Ice Clause (See Clause 32)   251
Port of Loading   252

17.   (a) In the event of the loading port being inaccessible by reason of   
ice when vessel is ready to proceed from her last port or at any time   253
during, the voyage or on vessel's arrival or in case of frost, sets in   254
after vessel's arrival, the Captain for fear of being frozen in is at   255
liberty to leave without cargo, and this Charter shall be null and   256
void.   257
   258

(b) If during loading the Captain, for fear of vessel being frozen in   
deems it advisable to leave, he has liberty to do so with what cargo   259
he has on board and to proceed to any other port or ports with   260
option of completing cargo for Owners' benefit for any port or ports   261
including port of discharge. Any part cargo thus loaded under this   262
Charter to be forwarded to destination at vessel's expense but   263
against payment of freight, provided that no extra expenses be   264
thereby caused to the Receivers, freight being paid on quantity   265
delivered ( in proportion if lumpsum), all other conditions as per   266
Charter.   267
   268

(c) In case of more than one loading port, and if one or more of   
the ports are closed by ice, the Captain or Owners to be at liberty   269
either to load the part cargo at the open port and fill up elsewhere   270
for their own account as under section (b) or to declare the Charter   271
null and void unless Charterers agree to load full cargo at the open   272
port.   273
(d) This Ice Clause not to apply in the Spring.   274
   275

Port of discharge   
(a) Should ice ( except in the Spring ) prevent vessel from reaching   276
port of discharge Receivers shall have the option of keeping vessel   277
waiting until the re-opening of navigation and paying demurrage, or   278
of ordering the vessel to a safe and immediately accessible port   279
where she can safely discharge without risk of detention by ice.   280
Such orders to be given within 48 hours after Captain or Owners   281
have given notice to Charterers of the impossibility of reaching port of   282
destination.   283
   284

(b) If during discharging the Captain for fear of vessel being frozen   
in deems it advisable to leave, he has liberty to do so with what   285
cargo he has on board and to proceed to the nearest accessible   286
port where she can safely discharge.   287
   288

(c) On delivery of the cargo at such port, all conditions of the Bill   
of Lading shall apply and vessel shall receive the same freight as   289
if she had discharged at the original port of destination, except that if   290
the distance of the substituted port exceeds 100 nautical miles, the   291
freight on the cargo delivered at the substituted port to be increased   292
in proportion.   293
   294

**RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN"**
**CHARTER PARTY DATED 04th NOVEMBER 2014**

18.    **TBN CLAUSE**

Vessel to be subject to technical Charterers'/Shippers'/Receivers' approval which is not to be unreasonably withheld and declarable within 24 hours after nomination.

Nomination to be provided accordingly below format together with G.A.PLAN

ETA loading port
Current position
Ports before loading port

Built
DWT (SSW)
TPC
LOA / beam
H
Holds/hatches
Hatch sizes
1.-
2.-
3.-
4.-
5.-
Hold dimensions
1.-
2.-
3.-
4.-
5.-
Crane capacities
Crane outreach
Ship Owners
Flag
Tank top strength:
1.-
2.-
3.-
4.-
5.-

Charterers to confirm Vessel within 1 (one) working day after receipt of nomination with full description as per enclosed questionnaire format.

18.1 The performing Vessel to be single decker/bulk carrier, maximum 20 years old, in case Owners request to nominate a Vessel older than 20 years but under 25 years, same to be

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN "
CHARTER PARTY DATED 04th NOVEMBER 2014

submitted to Charterers for their approval and extra insurance premium if any to be for Owners'
account.

Vessel to be classified highest Lloyds or other classification society which is full member of
I.A.C.S. Vessel to be fully P&I covered with a first class P&I Club.

Vessel to be fully suitable to receive and carry described cargo with sufficient tank top strength
to receive described cargo as per Shippers' standard stowage practice, in any case a minimum
15.5mt/m2 is required.

Owners confirm whether vessel could meet air draft limitation at discharge port:
Restrictions for Fairless:
38'06" (11.73m) = max allowable F.W. draft 132' (40.24m) = max allowable airdraft

18.2 If scheduled voyage includes U.S. ports calls, Vessel to comply in full with us regulations
including public laws 85-7429 - safety and health regulations for long shoring - and test
certificates to be in full accordance with international dock safety convention, for the full
duration of this valid for duration this C/P. if longshoremen are not permitted to work due to
Owners' failure to comply with such regulations, any delay or expenses, including idle gangs
charges , incurred thereby as well as time lost shall be for Owners' account.
Owners to guarantee that minimum terms and conditions of crew employment comply and will
comply during this charter party duration with I.T.F agreement terms or a bona ide trade union
agreement acceptable to I.T.F.

18.3 If Messrs NOVAMARINE CARRIERS S.A. are Disponent Owners, full style and
domicile of original Owners and any other Disponent Owners in the chain to be stated on
nomination

No Iranian flag, no Iranian controlled ship, no "Iran" word in the ship's name , no ex Iranian
tonnage. No Syrian controlled tonnage.

Owners agree that the goods will not be transported on a vessel or by other carrier owned ,
flagged or chartered by any country, person or entity, which would cause Charterers to be in
violation or be penalised by U.S.A. economic sanctions laws .

Owners confirm that neither the Vessel nor any individual involved in operation and/or
Ownership and/or trading and/or Charterers of the Vessel is considered a "sanctioned" person
and/or entity by U.S. Office Of Foreign Assets Control . Charterers have the option to cancel
the contract anytime if the performing ship and/or head Owners and/or Disponent Owners or
any Owners in the chain appears to be listed by I.S.D. issued by U.S. Dept. Of Treasury - Office
Of Foreign Assets Control , see www.ustreas.gov/offices/enforcement/ofac/sdn/

The Owners shall not be obliged to comply with any orders for the employment of the Vessel in
any carriage, trade or on a voyage which will expose the Vessel, Owners, managers, crew, the
Vessel's insurers, or their re-insurers, to any sanction or prohibition imposed by any State,

**RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN"**
**CHARTER PARTY DATED 04th NOVEMBER 2014**

Supranational or International Governmental Organisation (which include OFAC, any US santcons and European Union sanctions).

If the Vessel is already performing an employment to which such sanction or prohibition is subsequently applied, the Owners shall have the right to refuse to proceed with the employment and the Charterers shall be obliged to issue alternative destination within 48 hours of receipt of Owners' notification of their refusal to proceed. If the Charterers do not issue such alternative orders the Owners may discharge any cargo already loaded at any safe port (including the port of loading). Charterers' to remain responsible for all additional costs and expenses incurred in connection with such orders/delivery of cargo.

The Charterers shall indemnify the Owners against any and all claims whatsoever brought by the owners of the cargo and/or the holders of Bills of Lading and/or sub-charterers against the Owners by reason of the Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with Sub-clause (b).

Without prejudice to Charterers' other rights under this Charter party, Owners accept the responsibility for and agree to indemnify charterers against any and all claims, losses, damages , liabilities, cost (including legal fees) , fines and any and all consequential losses which result from partial or full non-compliance with this clause. Any and all delays to the vessel incurred as a result of the foregoing shall not count as laytime or time on demurrage.

18.4 Without prejudice to any other contract terms, Charterers shall be at liberty to reject a Vessel nomination or to revoke at any time such a nomination if the Vessel is owned or chartered by an entity which is , or on reasonable ground is believed will be during the duration of the charter , subject to any insolvency , Receivership , administration or other equivalent proceedings in any jurisdiction

18.5 Owners failure to nominate a suitable vessel in due time:
Should Owners, in breach of "vessel nomination clause", be unable for any reason to nominate a suitable vessel in due time, Owners to be fully responsible for any direct damage thereby caused to Charterers and/or Shippers, consignees or their affiliates or servants. In case of such a breach, Charterers to grant Owners 48 hours of grace period to rectify the failure and, if Owners have not done so, Charterers shall be entitled to cancel the relevant voyage without further notice unless they choose to accept a nomination made in breach of owners obligation. Charterers' decision under this clause will be without prejudice to any of their rights of action or claim for damages hereinabove mentioned.
See also clause 24

19.   **Vessel's General Conditions:**

Owners guarantee that the Vessel is and shall be maintained for the duration of this charter party:
- tight , staunch and in every respect suitable to perform the voyage
- absolutely watertight
- complying with all rules and regulations at loading and discharging ports in terms of carriage ,

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN "
CHARTER PARTY DATED 04th NOVEMBER 2014

loading and discharge of named cargo and shall have on board all required certificates to be valid
- Classed by a member of the International Association of Classification Societies.  ITF fitted ISM approved, BIMCO standard ISM clause for voyage and time charter parties shall apply ISPS/ISSC compliant, BIMCO's ISPS/MTSA Clause For Voyage Charter Parties 2005 shall apply complying with all provisions of the United States Water Quality Improvement Act of 1970 and any rules and /or regulations and/or amendments issued thereunder

Owners warrant that the Vessel shall not change Ownership, name, Class, P&I Club without Charterers' written consent .
Owners warrant that the Vessel is not scheduled for break up or being sold for scrap during the duration of this Charter Party .

Owners further hereby warrant that Vessel will not drydock unless in a case of emergency affecting her seaworthiness and that specifically her gears, ventilators, hatchcovers, coamings and gaskets are in perfect order and condition.

Should Charterers detect any deficiencies regarding the Vessel's equipment at any time during the currency of this Charter Party, in particular with respect to the tightness of the hatchcovers, then the Master is obliged to rectify those shortcomings immediately but in any case prior to sailing to next loading or discharging port.

If required, the Vessel shall furnish a certified calibration scale for all tanks, including fore and aft peaks, double bottom tanks and deeptanks, if any.  Plimsoll marks amidship and draft marks both on port and starboard side to be clearly cut and marked on shell plating and Master to certify correctness of same.

20.   Cargo :

Unfinished Steel Slabs will be loaded, stowed, lashed, secured and dunnaged in accordance with the custom of the trade for the shipment of Unfinished Steel Slabs from Novorossiysk.

It is understood that California Block Stow System is not required.

Owners' option to supervise loading operation by their P. and I. representative.

Full cargo i.e. no part cargo option allowed
Notwithstanding anything elsewhere contained in this Charterparty ,
Charterers' cargo must not be transhipped or lightened , unless explicitly authorised by Charterers.

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN"
CHARTER PARTY DATED 04th NOVEMBER 2014

21.    **Loading/Discharging rates**

Load Rates:

Novorossiysk : 10,000 metric tons per weather working day of 24 consecutive hours
Saturdays,  Sundays,  and holidays included
Tuapse : 12,000 metric tons per weather working day of 24 consecutive hours, Saturdays,
Sundays and holidays included.

Discharge Rate : Philadelphia:

10,000 metric tons, per weather working of 24 consecutive hours, Saturdays, Sundays,  and
holidays included

22.    **Notice Of Readiness**

At Load And Discharging port Notice Of Readiness to be tendered always during office Hours
i.e. 8am/5pm Mondays To Fridays .

Master shall tender Notice of Readiness in writing to Shippers/Charterers/ Receivers through
the nominated loading/discharging port(s) agents when the Vessel is made all fast at
loading/discharging berth and made in all respect ready.

At loading port(s), Notice Of Readiness is not to be presented (or accepted) until all
compartments into which cargo under this Charter Party is to be loaded.  Vessel's holds are to
be clean and dry to Charterers', Shippers' And Receivers' entire satisfaction and ready in all
respects for loading / stowing of the cargo(es) under this Charter Party.

Only if the loading or discharging berth is unavailable upon Vessel's arrival and tendering
herself at the immediate and effective disposition of the Shippers /Charterers /Receivers , and
within laydays as regards loading , then the Master may warrant that the Vessel is in all respect
ready and may tender notice of readiness in writing from a customary waiting place of the
concerned port , whether in port or not , whether in berth or not , whether in free pratique or
not, whether in customs clearance or not .

Vessel is not entitled to tender Notice Of Readiness prior to agreed laydays and/or prior actual
readiness in all respects. Otherwise such notice of readiness shall become valid no earlier than
on the first day of laydays and only when the Vessel is actually ready in all  respects .

**22.1 Time Counting**

The laytime to start counting at 2pm if N.O.R. tendered prior noon and at 8am next working
day if N.O.R. tendered after noon .

At Loading Port Laytime to stop counting once lashing completed .

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN "
CHARTER PARTY DATED 04th NOVEMBER 2014

At Discharging port laytime to stop counting once full cargo discharged and any time used to dispose of the dunnage to be for Owners account .

Laytime is not reversible but Charterers have the option to average the eventual time saved in one port against the eventual time lost in the other port .

Once On Demurrage always on demurrage , however in case of ship's cranes breakdown time

23.   **Notices :**

ON FIXING OWNERS/MASTER TO GIVE LOAD PORT AGENTS AND MAVEGA ( shipping@mavegaltd.com ) E.T.A. PLUS HEREBELOW INFORMATION :

Vessel's present position
speed
eta next port of call
prospects for loading/discharging under preceiding commitment if any
and thereafter to keep giving daily notices of similar contents to loading port agents and Mavega

Master shall give Agents and Mavega 7 and 5 days approx notices and 3/2/1 days final notices of Vessel's E.T.A. at loading and discharging port .

**OWNERS/MASTER must inform the intended pre stowage plan as well as the intended loading sequence latest one working day prior to Vessel's arrival at load port .**

Upon sailing from loading port, Owners to inform Charterers about quantity loaded, number of piece, sailing date, rotation and E.T.A. at discharging port.
any unexpected event which may delay the intended/declared schedule/eta at discharging port of the Vessel has to be notified immediately to Charterers and agents at discharging port . Owners/Master have to keep charters/agents daily updated about any further development .

After sailing from load port, Master or Owners shall advice agents and Mavega of Vessel's ETA at discharging port at intervals not exceeding 48 hours

24.   **Laycan / Nomination:**

Laycan       : 01st /31st December 2014
Each cargo to be narrowed by Charterers to 5 days spread latest 12 days prior first day of laycan

Intended performing Vessel to be nominated latest 7 (seven) working days prior the beginning of laycan and final performing Vessel to be nominated latest 4 (four)  working days prior beginning of laycan .
Upon final performing Vessel nomination, Laycan to be narrowed by Charterers to a 3 days spread laycan (See also Clause 19 and 19.1)

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN "
CHARTER PARTY DATED 04th NOVEMBER 2014

24.1
If it appears that the vessel will be delayed beyond the cancelling date , Owners shall , as soon as it appears that the vessel cannot arrive by the cancelling date, give notice thereof to the charterers together with the date the vessel should be ready, requesting a revised and reasonable cancelling date to apply to the shipment within 1 ( one ) working day of Charterers' receipt of Owners' request, Charterers will advise Owners whether they accept the revised cancelling date (or if they are unable to accept the date requested then they may advise the cancelling date that is acceptable) .

24.2
Charterers to confirm ship's acceptance within 24 hours from receipt of full nomination inclusive of GA Plan and Steel Questionnaire.

25.   **Freight Rates**

Freight rates per metric ton free in/out stowed, lashed, secured, dunnaged on Bill of Lading quantity 1 – 1 :

U.S. 16.25 ( sixteen dollars and twenty - five cents)  per metric ton basis Kinder Morgan Terminal.
U.S. 15.70 ( fifteen dollars and seventy cents) per metric ton basis Holt Terminal.

26.   **Hatchcovers Condition and Operation :**

Opening and closing of hatches to be done by Vessels' crew at Owners' expenses and time, provided local labour regulations permit.

The Master to arrange for the closing of the hatches in case of precipitation / weather conditions perilous to the cargo, unless otherwise formally instructed by Charterers, in writing.

It is understood that only Charterers have the option to instruct the loading and/or discharging on period(s) during which such weather conditions may be prevailing, provided Master agrees to same, considering the nature of cargo and weather conditions prevailing at the time of request.

In case the loading / discharging operations cannot commence because the hatches are not open or Authorities / longshoremen are not able / allowed to board the ship, all consequential costs, including but not limited to time lost, gangs stand-by, etc., arising therefrom to be for Owners' account.

Hatchcovers or any other equipment(s) to be stowed in such a way that it does not interfere with loading / discharging operations.  In case the Vessel's hatches are 'rammek taped', the crew to remove the tapes prior to tendering Notice of Readiness at discharge port(s).  Owners guarantee that Vessel's hatchcovers are in good condition and watertight to Classification Societies

**RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN"
CHARTER PARTY DATED 04th NOVEMBER 2014**

Regulation and will be so maintained for the whole duration of the voyage.

27.   **Hold Conditions :**

Upon tendering Notice of Readiness, Vessel's holds are to be clean and dry to Charterers', Shippers' and Receivers' entire satisfaction and ready in all respects for loading and discharging of the cargo, as applicable.

In case of any dispute, a Lloyd's surveyor or a jointly appointed independent surveyor's decision to be final and binding upon both parties. In case surveyors' findings confirm the readiness of the holds, the cost of the survey will be for Charterers' / Shippers' account and time to count in accordance with the original Notice of Readiness tendered.

In case surveyors' findings do not confirm the readiness of the holds, Owners are to take immediately the necessary steps in accordance with the surveyors' recommendations and Notice of Readiness is to be valid only upon the surveyors' confirmation that the holds are in all respects ready to load or discharge. In such instance, all surveyor's costs are to be for Owners' account. Master to take proper care throughout the entire voyage, particularly during loading and discharging operations to keep cargo hold(s) dry at all times.

28.   **Ventilation :**

Whilst on passage, Master is to ensure that Vessel's ventilation system, be it natural or mechanical, is functioning properly so as to minimise the potential for atmospheric rust which might occur due to condensation in the holds.

29.   **Stevedores/Stevedoring Damages :**

Notwithstanding anything appearing elsewhere in this Charter Party , Stevedores , even when appointed and/or paid by Shippers /Charterers/Receivers , shall be deemed the servants of the Vessel/Owners and shall work under the direction , control, supervision and responsibility of the Master who will be responsible for proper stowage and the seaworthy, trim of the Vessel .

Stevedores damage , if any , to be settled directly between Owners and Stevedores  and / or Shippers/Receivers without any involvement of Charterers.
Master must notify Stevedores and Shippers/Receivers of Stevedores damage,if any , in writing as soon as reasonably possible after occurrence and in any event before completion of loading/ discharging , as applicable .

Any claim for Stevedores damages shall be deemed to be waived and absolutely barred if not presented by Master/Owners within 24 ( twenty four ) hours after occurrence. if , despite the exercise by the Vessel/Owners of utmost diligence and all their fulfilment of all proper formalities , Owners and/or their P&I club are unable to settle any such a claim directly with Stevedores and/or Shippers/Receivers , Charterers may be requested to assist Owners in this respect , always on the basis that Charterers shall bear no responsibility whatsoever for the settlement of the claims and/or any sums payable under such settlement(s) and/or

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN"
CHARTER PARTY DATED 04th NOVEMBER 2014

any consequences of the inability to conclude a settlement on satisfactory terms

30.   **Overtime / Shifting :**

Shifting and Overtime, if any, at loading and discharging port to be for the account of the party ordering same but crew's and officer's overtime always to be for Owners' account.
Overtime at the loading and discharging port, if any, ordered by Port Authorities to be for Charterers' / Shippers' / Receivers' account respectively.

Vessel movement alongside the quay , not to be considered shifting and time and cost to be for Charterers account unless ordered by Owners/port authorities in which case time and cost to be for Owners' account

Opening and closing of hatches to be done by Vessel's crew at Owners' expense and time, provided local labour regulations permit the same.

At loading port, in case of loading on two berths, shifting time to be for owners account and not count as laytime.

31.   **Demurrage / Despatch**

Demurrage rate to be advised on Ships' nomination and to be between 10.000  US$ and 17.000 US$ per day or pro rata is to be paid by Charterers to the Owners for all laytime  lost at loading/discharging port.
Despatch to be half demurrage rate to be paid by the Owners to the Charterers for working time saved only.

Shifting time from anchorage to berth does not count as laytime even if the ship is already in demurrage

Laytime calculations to be submitted by Owners to Charterers within 20 days from completion of voyage

32.   **Light Clause :**

The Vessel to provide  sufficient  power  day  and  night  free  of  expenses  to Charterers/Shippers/Receivers for sufficient light on deck and holds for night work if and where required .

33.   **Stowage :**

Stevedores, although appointed and paid for by Shippers' / Charterers' / Receivers', are to be considered Owners' servants and shall load, stow, lash, secure, dunnage and discharge the cargo(es) under this Charter Party in accordance with Master's instructions, direction and control, up to his entire satisfaction and under his responsibility and so Master is to remain

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN "
CHARTER PARTY DATED 04th NOVEMBER 2014

responsible for proper stowage, lashing and securing of the cargo(es).

No cargo to be loaded into compartments obstructed by stanchions, posts or any other obstacles which are not easily accessible to cranes / derricks and/or forklifts operation.

Charterers' / Shippers' / Receivers' to have the option of using rubber wheeled forklift trucks in Vessel's holds for loading and discharging.  Owners guarantee that Vessel's flooring is complete and in good condition and able to stand the weight of forklift trucks carrying cargo, provided that the weight will not exceed the tanktop strength.

It is understood that Shippers' / Receivers' / Stevedores' should use their normal equipment to perform the loading and discharging of the cargo(es).

When considering and deciding the stowage plan, as well as the space(s) to be reserved for the proper allocation of Charterers' cargo, it is understood that – and Owners are to take same into account – Shippers' and Receivers' stowage and operational standards, as well as all restrictions applicable to each of the products which compose the contracted cargo(es), are to prevail but subject to Master's approval.

Master's approval is not to be unreasonably withheld and to be declared anyway upon discussing the stowage plan with Stevedores / Shippers / Receivers, as applicable, but in any case prior to the commencement of loading and discharging operations.

34.   **Cargo Operations :**

Charterers / Shippers / Receivers have the right to work all designated hatches at all times , day and night , to perform the loading and discharging operation and the Vessel is bound to receive and deliver the cargo at any time including during periods excepted from the laytime.

34.1  In case performing vessel has max 25ts respectively 30ts gears , for slabs over 25 respectively 30ts , shore gears and shore cranes cost to be for Charterers account

35.   **Gear Clause :**

DELETED

36.   **Dunnage / lashing material :**

All dunnage and lashing material on board the vessel, if any to be at Charterers' / Shippers' disposal free of charge. Dunnage disposal cost and time to be for Owners' account.

Dunnage/lashing material required to be supplied by shippers / Charterers at their expenses but any extra dunnage required by the Master over the normal and usual dunnage ordinarily employed by the shippers, will be for Owners' account. Dunnage supplied by Charterers left on board after completion of discharging operations to be disposed of by the vessel. Same to remain Owners' property unless receivers or stevedores lay claim on same. In case Receivers or Stevedores do not lay claim on dunnage , time used for dunnage disposal to be for owners

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN "
CHARTER PARTY DATED 04th NOVEMBER 2014

account
Wooden dunnage to be stamped as per I.S.P.S. 15 regulation but no phytosanitary certificate to
be supplied

37.  **Responsibility on the Number of Pieces :**

Notwithstanding anything elsewhere contained in this Charter Party, Owners and Master are to
be responsible for the delivery of the number of pieces and/or packages loaded and signed for in
Mate's Receipt(s) and Tally Clerk's Receipt(s) and so hereby liable for all losses resulting from
short delivery of pieces and/or packages towards Charterers, Receivers or any third party which
may be legally representing them.

Owners are to settle promptly and in full any of such claims provided same are supported by
relevant documentation, but in any case latest within 30 (thirty) days of Owners' receipt of
same.

Short delivery claims which are not presented within 12 (twelve) months from the date of
departure of the Vessel from the respective port of discharge are to be waived and barred.
However, it is understood that Charterers/Shippers/Receivers will appoint their/port Tally Clerk
and Disponent Owners will appoint their P.and I. representative in order
to determinate cargo quantity/quality.

38.  **Bill(s) of Lading :**

Bills of lading to be Gencon 1994 marked "freight pre paid" and to be in strict conformity with
mates receipts .

Mate's receipt(s) intended remarks, if any, must be specific and cargo related and to be
announced to Shippers And Charterers at least 1 (one) working day prior to completion of
loading operations so to allow Shippers And Charterers to verify Master's and/or P.andI.
Representatives' observations.

Bill(s) of lading to contain the following clause: "this Bill of Lading is to constitute conclusive
evidence of the number of slabs shipped on board". In any case, unless Master provides formal
and conclusive evidence contrary to the number of pieces and/or packaged declared by Shippers
and/or Charterers as shipped on board prior to her departure from loading port, remarks
referring to the number of pieces and/or packages will not be acceptable in any case
whatsoever, neither in the Mate's Receipts nor in the Original Bill(s) Of Lading, which are to
constitute conclusive evidence of the number of pieces and/or packages shipped on board.

In case Original Bills Of Lading will not arrive at Discharging port on time ,Charterers have the
option to discharge and release the cargo against a letter of indemnity signed by Charterers
only.. Letter of Indemnity to be in Owners' P&I wording which please submit to Charterers for
their check and approval on fixing .

Charterers have the option to let load port agents sign Bills of Lading in which case Master to

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN "
CHARTER PARTY DATED 04th NOVEMBER 2014

authorise agents in writing accordingly .

**39.** **Relet**

Owners are not authorised to relet, be it entirely or partially, the cargo to be carried under this charter unless explicitly authorised by charterers

**40.** **Freight Payment**

The freight is to be fully prepaid, less commission(s) latest within 5 (five) banking days after completion of loading and receipt of Owners' freight invoice. Bill(s) of Lading marked "Freight Prepaid" to be released immediately upon Owners confirm received full freight.

Full freight deemed earned on shipment discountless, non-returnable ship and/or cargo lost or not lost.

Freight to be paid to Owners bank as stated below:
(as advised)

**41.** **Tax Clause :**

Any taxes/dues/wharfages/charges on vessel/freight to be for Owners' account, any takes/dues/wharfages/charges on cargo to be for Charterers' account

**42.** **Certificates :**

Owners warrant that the Vessel will be at all times in possession of all necessary certificates to comply with safety and health regulations as well as all current certificates, including those concerning international classification and insurance standards, at all ports of call during currency of this Charter Party.

Owners also warrant that during the currency of this Charter Party, Vessel will fully comply with all provisions of the United States Water Quality Improvement Act of 1970 and any rules and/or regulations and/or amendments issued thereunder.

**43.** **Charterers' Responsibility :**

Charterers' liability shall cease as soon as the cargo is shipped, except for payment of freight, deadfreight and demurrage and/or damages for detention, as applicable.

**44** **Protective Clauses :**

Chamber of Shipping War Risk Clauses 1 and 2, New Jason Clause, New Both-to-Blame Collision Clause and P. and I. Bunkering Clause to be incorporated in this Charter Party. Congenbill 1994 Clause Paramount to be incorporated in all Bill(s) of Lading issued hereunder.

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN "
CHARTER PARTY DATED 04th NOVEMBER 2014

| 45. | Agents : |
|---|---|

Vessel's Agents at all loading and discharging ports are to be nominated by Charterers with intention as follows:

Novorossiysk
Farco LLC
353900, 42a Gubernskogo Str.,
Novorossiysk, Russia
Tel: +7-8617-30-30-39/41
Fax: +7-8617-30-30-49
E-Mail: agency@ma.farcom.ru

Tuape
LLC " Universal Forwarder", Tuapse Branch
Phone:  +7 (86167) 71591, 71954
Fax:       +7 (86167) 22440
Mob.     +7 (988)1500687
E-Mail:  agent.tuapse@unfc.ru
Skype:   uf-agent.2

Philadelphia :
PIC: Bob Keeney
Terminal Shipping Company, Inc.
1 Saville Avenue
Eddystone, Pa 19022
Tel: (610) 490-4010
Fax: (610) 490-4015
Email: opsphl@termship.com

45.1 Port disbursements at Loading / Discharging ports to be for Owners' account.
Owners to put agents in funds both at Loading and Discharging ports before Vessel's arrival

| 46. | Restrictions at Load and Discharge : |
|---|---|

Owners shall satisfy themselves about any/all prevailing berth(s), port(s) and passage restrictions at load and discharge and it is hereby understood that Owners have checked all related restrictions through their own sources.

It is further understood that Owners will take all related restrictions, including but not limited to those concerning draft / airdraft / LOA / Beam, prevailing at each port of call into due consideration when deciding Vessel's overall rotation.

The Vessel is to be left in a seaworthy trim to Master's satisfaction between loading port(s) and

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN "
CHARTER PARTY DATED 04th NOVEMBER 2014

berth(s) as well as discharging port(s) and berth(s).

Owners are to be responsible for adequate arrival draft at designated discharge port(s).

47.   **ISM Code Clause :**

From the date of coming into force of the International Safety Management (I.S.M.) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the I.S.M. Code) shall comply with the requirements of the I.S.M. Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the I.S.M. Code shall be for the Owners' account.

Owners are to provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers latest within 3 (three) working days of the Charter Party dated respectively performing Vessel's nomination date as applicable, failing which Charterers have the right of cancelling the Charter Party at any time, unless written Notice of Readiness at first loading port has been formally accepted.

48.   **Inspection Clause :**

Charterers have the right to nominate their own surveyor(s) to inspect the condition of Vessel and/or cargo and/or stowage at loading and discharging port(s) and Master and Owners are to permit the work of such surveyor(s) on board of the Vessel and inside her holds.
Charterers shall be allowed to take pictures during inspections

49.   **Force Majeure**
Whether declared or not, civil war, riots and revolutions, acts of sabotage, natural disasters such as violent storms, cyclones, earthquakes, floods, destruction by lightening, explosions, fires, destruction of mining machinery, and of any kind of installations, boycotts, sanctions , strikes and lock-outs of all kinds, go-slows, occupation of mines and premises, work stoppages whether partial or total, political disturbances, acts of authority, whether lawful or unlawful, accidents and/or breakdowns at the mines, at Shippers or Receivers works or wharf, partial or total stoppage on railways, rivers, or canals, intervention of sanitary, customs, and/or other constituted authorities, epidemics, quarantine, or any other causes or hindrances whatsoever beyond the control of the Charterer, shipper or suppliers of cargo, preventing or delaying the mining, supplying, loading, discharging or receiving of the cargo are excepted, and time lost at

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN "
CHARTER PARTY DATED 04th NOVEMBER 2014

any time by reason of all or any of the aforementioned causes shall not be computed in the
loading or discharging time unless vessel is already on demurrage.

An occurrence of same exceeding a period of 7 days, directly or indirectly affecting the
performance of this Charter Party will entitle the Charterer to cancel this Charter Party ,the
particular individual cargo nominated to be carried without liability for any loss or damage,
provided vessel is free of cargo.

EXCEPTIONS TO THE FOLLOWING CLAUSE TO APPLY

If there is a strike or lock-out affecting the discharge of the cargo on or after vessel's arrival at
or off the port of discharge and same has not been settled within 48 (forty-eight) hours , the
receivers shall have the option of keeping the vessel waiting until such a strike or lock-out is at
an end against paying half demurrage after the expiration of the time provided for discharging
or of ordering the vessel to a safe port where she can safely discharge without risk of being
detained by strike or lock-out. Such orders to be given within 48 (forty-eight) hours after the
master of the owners have given notice to Charterers of the strike or lock-out affecting the
discharge.

On delivery of the cargo at such port, all conditions of this Charter party and of the Bill(s) of
lading shall apply and the vessel shall receive the same freight as if she had discharged at the
original port of destination, except that if the distance of the substitute port exceeds 100 nautical
miles, the freight on the cargo delivered at the substitute port to be increased in proportion.

50.    **USCG COMPLIANCE CLAUSE**
Owners warrant that during the terms of the Charter Party the vessel shall be in full compliance
with all U.S Coast guard pollution and safety regulations as contained in , but not limited to ,
titles 33 and 46 of the code of federal regulations as amended and all applicable california and
other states pollution and safety laws , rules and regulations as may be promulgated .

Owners shall indemnify charterers for any and all loss , expenses and/or damage sustained by
charterers resulting from non-compliance with this clause. Any and all delay to the vessel
resulting from such non-compliance shall not count as laytime or,if laytime has expired , as
time on demurrage.

51.    **Arbitration :**

Any dispute arising between Owners and Charterers under this Charter Party shall be referred to
Arbitration in London and English Law to apply.

One Arbitrator to be appointed by Owners and the other by Charterers.   In case the two
arbitrators not agreeing, an Umpire to be appointed by them.

The award of the two arbitrators or the Umpire to be final and binding upon both parties.

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN "
CHARTER PARTY DATED 04th NOVEMBER 2014

Arbitrators to be commercial shipping men.

For claims up to U.S. $50,000 (Twenty-Five Thousand Dollars), the L.M.A.A. Small Claims Procedure to apply.

52.  Vessels not to force ice nor to follow ice-breakers or breach Institute Warranty Limits.

53.  The names of this Rider Clauses are merely an illustrative and non-binding meaning and carry non legal weight whatsoever .

54.  The terms of the Rider Clauses shall, in case of conflict prevail over those  of the Charter Party
     .

55.  This Charter Party, its details and any related agreements hereunder shall be kept strictly private and confidential and shall not be reported or disclosed to any outer party unless an explicit mutual consent of the Charterers and the Owners

* * *

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN "
CHARTER PARTY DATED 04th NOVEMBER 2014

## BOTH TO BLAME COLLISION CLAUSEPRIVATE

If the liability for any collision in which the Vessel is involved while
performing this Charter Party falls to be determined in accordance with
the laws of the United States of America, the following clause shall apply :-

## BOTH TO BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other ship
and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the
navigation or in the management of the ship, the Owners of the goods carried hereunder will
indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners
in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the
Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to
the Owners of the said goods and set off, recouped or recovered by the other or non-carrying
ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of
any ship or ships or objects other than, or in addition to, the colliding ships or objects are at
fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall
contain the same clause.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1974, but where the
adjustment is made in accordance with the law and practice of the United States of America, the
following clause shall apply :-

## NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the
voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or
for the consequence of which, the carrier is not responsible, by statute, contract or otherwise,
the goods, Shippers, consignees or Owners of the goods, shall contribute with the carrier in
general average to the payment of any sacrifices, losses or expenses of a general average nature
that may be made or incurred and shall pay salvage and special charges incurred in respect of
the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as
if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents
may deem sufficient to cover the estimated contribution of the goods and any salvage and
special charges thereon shall, if required be made by the goods, Shippers, consignees or Owners
of the goods to the carrier before delivery."

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN "
CHARTER PARTY DATED 04th NOVEMBER 2014

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

## WAR RISK CLAUSESPRIVATE

"(1) No Bills of Lading to be signed for any blockaded port and if the port of discharge be declared blockaded after Bills of Lading have been signed, or if the port to which the ship has been ordered to discharge either on signing Bills of Lading or thereafter be one to which the ship is or shall be prohibited from going by the Government of the Nation under whose flag the ship sails or by any other Government, the Owners shall discharge the cargo at any other port covered by this Charter Party as ordered by the Charterers (provided such other port is not a blockaded or prohibited port as above mentioned) and shall be entitled to freight as if the ship had discharged at the port or ports of discharge to which she was originally ordered".

"(2) The Ship shall have liberty to comply with any orders or directions, as to departure, arrival, routes, ports of call, stoppages, destinations, delivery or otherwise howsoever given by the Government of the Nation under whose flag the Vessel sails or any department thereof, or by any other Government or any department thereof, or any person acting or purporting to act with the authority of such Government or of any department thereof, or by any committee or person having, under the terms of the War Risks Insurance on the ship, the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is doe or is not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or directions shall be a fulfilment of the contract voyage and the freight shall be payable accordingly".

## P. AND I. CLUBS OIL BUNKERING DEVIATION CLAUSEPRIVATE

The Vessel in addition to all other liabilities shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever, whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks, deeptanks and any other compartment in which oil can be carried, whether such amount is or is not required for the chartered voyage.

## ISPS/MTSA CLAUSE FOR VOYAGE CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN "
CHARTER PARTY DATED 04th NOVEMBER 2014

SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA.

(ii) Loss, damages or expense (excluding consequential loss, damages or expense) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party, and any delay caused by such failure shall count as laytime or time on demurrage.

(c) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code/MTSA, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code/MTSA.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code/MTSA shall count as laytime or time on demurrage, unless such measures result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers.

(d) Notwithstanding anything to the contrary provided in this Charter Party, any costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(e) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

RIDER CLAUSES TO M.V. "NOVAMARINE CARRIERS TBN "
CHARTER PARTY DATED 04th NOVEMBER 2014

---

*Footnote: This Clause replaces previously published ISPS Clause for Voyage Charter Parties
AND the US Security Clause for Voyage Charter Parties, both of which are now officially
withdrawn.*



Nova Marine Carriers SA
Via Bagutti 6
6900 Lugano - Switzerland

# EXHIBIT D

CODE NAME: "CONGENBILL" EDITION 1994

Page 2

| | |
|---|---|
| Shipper<br>OJSC NOVOLIPETSK STEEL (NLMK) | BILL OF LADING No. PXBCTUPHFROS0101<br>TO BE USED WITH CHARTER-PARTIES<br>Reference No. |

Consignee
TO THE ORDER OF:
NOVEXCO (CYPRUS) LIMITED
1, DEMOFONTOS STR., OFFICE 501,
1075 NICOSIA, CYPRUS

Notify
NLMK PENNSYLVANIA CORP.
15 ROEMER BLVD.
FARRELL, PA 16121
PHONE: (724) 983-6464

COPY
non negotiable

| Vessel<br>m/v "FRATZESCOS" | Port of loading<br>TUAPSE, RUSSIA |
|---|---|

Port of discharge
PHILADELPHIA, USA

Shipper's description of goods           Gross weight           Net weight
MATERIAL: PRIME STEEL SLABS
SALES ORDER NO. NC-NLMK.PA-14-11-01

THIS BILL OF LADING IS TO CONSTITUTE CONCLUSIVE EVIDENCE OF QUANTITY SHIPPED ON BOARD

| Spec | Steel grade | Size (mm) | No. of Slabs | Gross/Net Weight, MT |
|---|---|---|---|---|
| 548 | 1006/SAE J403 | 250x1250x8100-9000 | 516 | 11 352,680 |
| 549 | 1008/SAE J403 | 250x1120x9000 | 58 | 1 145,800 |
| 550 | 1008/SAE J403 | 250x1150x9000 | 88 | 1 786,120 |
| 551 | 1008/SAE J403 | 250x1290x9000 | 89 | 2 023,660 |
| 552 | 1010/SAE J403 | 250x1020x8100-9000 | 73 | 1 318,000 |
| 553 | 1010/SAE J403 | 250x1080x8400-9000 | 93 | 1 773,290 |
| 554 | 1010/SAE J403 | 250x1180x8980-9000 | 88 | 1 831,040 |
| 555 | 1010/SAE J403 | 250x1250x8100-9000 | 420 | 9 245,340 |
| 556 | 1010/SAE J403 | 250x1290x8980-9000 | 88 | 1 996,900 |
| 560 | 1021/SAE J403 | 250x1250x8700-9000 | 140 | 3 083,180 |
| 562 | G/ASTM A414 | 200x950x7170 | 118 | 1 265,820 |
| 563 | G/ASTM A414 | 250x1070x8700-9000 | 64 | 1 205,970 |
| 564 | G/ASTM A414 | 250x1220x8200-9000 | 64 | 1 373,670 |
| | Total | | 1899 | 39 401,470 |

MASTER'S REMARKS:
- Stored at open area, wet before shipment;
- Rust stained;
- Cargo surface covered with coal dust;
- Weight and quality as per shipper's declaration.

(of which)           on deck at Shipper's risk; the Carrier not being responsible for loss or damage howsoever arising)

| | | |
|---|---|---|
| Freight payable as per<br>CHARTER-PARTY dated<br>FREIGHT ADVANCE.<br>Received on account of freight: | | SHIPPED at the Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above.<br>Weight, measure, quality, quantity, condition, contents and value un-known.<br>IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others shall be void.<br>FOR CONDITIONS OF CARRIAGE SEE OVERLEAF |
| Time used for loading        days        hours. | | |
| | Freight payable<br>FREIGHT PREPAID | Place and date of issue<br>TUAPSE, RUSSIA<br>DECEMBER 14, 2014 |
| | Number of original Bs/L<br>3 /THREE/ | Signature<br>MASTER OF m/v "FRATZESCOS"<br>CAPT. TOMARAS, ATHANASIOS |

EXHIBIT
D

CODE NAME: "CONGENBILL" EDITION 1994

Shipper
OJSC NOVOLIPETSK STEEL (NLMK)

BILL OF LADING No. PXBCTUPHFROS0102
TO BE USED WITH CHARTER-PARTIES
Reference No.

Consignee
TO THE ORDER OF:
NOVEXCO (CYPRUS) LIMITED
1, DEMOFONTOS STR., OFFICE 501,
1075 NICOSIA, CYPRUS

Notify
NLMK PENNSYLVANIA CORP.
15 ROEMER BLVD.
FARRELL, PA 16121
PHONE: (724) 983-6464

copy
non negotiable

Vessel
m/v "FRATZESCOS"

Port of loading
TUAPSE, RUSSIA

Port of discharge
PHILADELPHIA, USA

Shipper's description of goods | Gross weight | Net weight
MATERIAL: PRIME STEEL SLABS
SALES ORDER NO. NC-NLMK.PA-14-11-02

THIS BILL OF LADING IS TO CONSTITUTE CONCLUSIVE EVIDENCE OF QUANTITY SHIPPED ON BOARD

| Spec | Steel grade | Size (mm) | No. of Slabs | Gross/Net Weight, MT |
|------|-------------|-----------|--------------|----------------------|
| 569 | 1006/SAE J403 | 250x1150x9000 | 53 | 1 081,040 |
| 570 | 1006/SAE J403 | 250x1250x9000 | 31 | 685,620 |
| 574 | 1008/SAE J403 | 250x1120x9000 | 61 | 1 203,110 |
| 575 | 1008/SAE J403 | 250x1150x8700-9000 | 80 | 1 619,300 |
| 576 | 1008/SAE J403 | 250x1250x9000 | 70 | 1 541,300 |
| 577 | 1008/SAE J403 | 250x1290x9000 | 55 | 1 246,580 |
| 579 | 1010/SAE J403 | 250x1080x9000 | 46 | 874,100 |
| 580 | 1010/SAE J403 | 250x1120x8970-9000 | 53 | 1 043,780 |
| 581 | 1010/SAE J403 | 250x1150x9000 | 45 | 911,400 |
| 582 | 1010/SAE J403 | 250x1250x8970-9000 | 47 | 1 032,650 |
| 584 | 1021/SAE J403 | 250x1120x8980-9000 | 95 | 1 874,620 |
| | Total | | 636 | 13 113,500 |

MASTER'S REMARKS:
- Stored at open area, wet before shipment;
- Rust stained;
- Cargo surface covered with coal dust;
- Weight and quality as per shipper's declaration.

(of which                    on deck at Shipper's risk; the Carrier not being responsible for loss or damage howsoever arising)

Freight payable as per
CHARTER-PARTY dated

FREIGHT ADVANCE.
Received on account of freight:

Time used for loading          days          hours.

SHIPPED at the Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified therein.
Weight, measure, quality, quantity, condition, contents and value unknown.
IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others shall be void.
FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

Freight payable
FREIGHT PREPAID

Place and date of issue
TUAPSE, RUSSIA
DECEMBER 14, 2014

Number of original Bs/L.
3 /THREE/

Signature
MASTER OF m/v "FRATZESCOS"
CAPT. TOMARAS, ATHANASIOS

# EXHIBIT E

 # NOVEXCO (CYPRUS) LIMITED

*1, Demofontos Str., Office 501, 1075 Nicosia, Cyprus*
*Tel: + 357 22 87 56 46, Fax: + 357 22 87 58 61*

---

*NLMK Pennsylvania Corp.*
*15 Roemer Blvd.*
*Farrell, PA 16121*

*14 December 2014*

## COMMERCIAL INVOICE No 14-12-4976-4988

Contract No NC-NLMK.PA-14-11-01
Our Ref.: 151-196/14-185

Payment Terms: open terms 90 days after B/L date

---

### Prime Concast Steel Slabs

*Producer:  OJSC Novolipetsk Steel*
*Country of origin: RUSSIA*

**VESSEL: FRATZESCOS B/L No PXBCTUPHFROS0101 dtd 14.12.2014**
*Port of Loading: TUAPSE*
*Port of Discharge: PHILADELPHIA/USA*
*Term of Delivery: CIF PHILADELPHIA PORT*

| Invoice No | Spec | Grade | Size (mm) | Pcs | Net/Gross (mt) | Price(USD/mt)/ Amount (USD) |
|---|---|---|---|---|---|---|
| 14-12-4976 | 548 | 1006/SAE J403 | 250,00x1250x8100-9000 | 516 | 11 352,680 | 491,00(USD/mt) |
| 14-12-4977 | 549 | 1008/SAE J403 | 250,00x1120x9000 | 58 | 1 145,800 | 491,00(USD/mt) |
| 14-12-4978 | 550 | 1008/SAE J403 | 250,00x1150x9000 | 88 | 1 786,120 | 491,00(USD/mt) |
| 14-12-4979 | 551 | 1008/SAE J403 | 250,00x1290x9000 | 89 | 2 023,660 | 491,00(USD/mt) |
| 14-12-4980 | 552 | 1010/SAE J403 | 250,00x1020x8100-9000 | 73 | 1 318,000 | 491,00(USD/mt) |
| 14-12-4981 | 553 | 1010/SAE J403 | 250,00x1080x8400-9000 | 93 | 1 773,290 | 491,00(USD/mt) |
| 14-12-4982 | 554 | 1010/SAE J403 | 250,00x1180x8980-9000 | 88 | 1 831,040 | 491,00(USD/mt) |
| 14-12-4983 | 555 | 1010/SAE J403 | 250,00x1250x8100-9000 | 420 | 9 245,340 | 491,00(USD/mt) |
| 14-12-4984 | 556 | 1010/SAE J403 | 250,00x1290x8980-9000 | 88 | 1 996,900 | 491,00(USD/mt) |
| 14-12-4985 | 560 | 1021/SAE J403 | 250,00x1250x8700-9000 | 140 | 3 083,180 | 500,00(USD/mt) |
| 14-12-4986 | 562 | G/ASTM A414 | 200,00x950x7170 | 118 | 1 265,820 | 509,00(USD/mt) |
| 14-12-4987 | 563 | G/ASTM A414 | 250,00x1070x8700-9000 | 64 | 1 205,970 | 509,00(USD/mt) |
| 14-12-4988 | 564 | G/ASTM A414 | 250,00x1220x8200-9000 | 64 | 1 373,670 | 509,00(USD/mt) |
| | | | **Total** | **1 899** | **39 401,470** | **19 443 088,67 USD** |

*TOTAL AMOUNT 100,00%: 19 443 088,67 USD*
*TOTAL DUE: 19 443 088,67 USD*

*/Nineteen million Four hundred and Forty Three thousand Eighty Eight 67/100 USD/*

*DUE DATE: 14 March 2015*

| | |
|---|---|
| **BENEFICIARY:** | **NOVEXCO (CYPRUS) LIMITED** |
| BANK: | ING BELGIUM SA/NV BRUSSELS GENEVA BRANCH |
| | Rue Petitot 6, P.O.Box 5613 |
| | CH 1211, Geneva 11 |
| SWIFT: | BBRUCHGTXXX |
| Account No: | 1071603 USD |
| Iban No: | IBAN: CH8108387000001071603 |

*CORRESPONDING BANK:     Deutsche Bank Trust Company Americas*

*SWIFT: BKTRUS33*

---

*Novexco (Cyprus) Ltd, Registration number 208398*
*Registered address: 12 Egypt Street, 1097 Nicosia, Cyprus*

**EXHIBIT**

E



# NOVEXCO (CYPRUS) LIMITED

*1, Demofontos Str., Office 501, 1075 Nicosia, Cyprus*
*Tel: + 357 22 87 56 46, Fax: + 357 22 87 58 61*

> *NLMK Pennsylvania Corp.*
> *15 Roemer Blvd.*
> *Farrell, PA 16121*

*14 December 2014*

## COMMERCIAL INVOICE No 14-12-4989-4999

Contract No NC-NLMK.PA-14-11-02
Our Ref.: 151-196/14-185

Payment Terms: open terms 90 days after B/L date

### Prime Concast Steel Slabs

Producer:  OJSC Novolipetsk Steel
Country of origin: RUSSIA

**VESSEL: FRATZESCOS B/L No PXBCTÜPHFROSO102 dtd 14.12.2014**
Port of Loading: TUAPSE
Port of Discharge: PHILADELPHIA/USA
Term of Delivery: CIF PHILADELPHIA PORT

| Invoice No | Spec | Grade | Size (mm) | Pcs | Net/Gross (mt) | Price(USD/mt)/ Amount (USD) |
|---|---|---|---|---|---|---|
| 14-12-4989 | 569 | 1006/SAE J403 | 250,00x1150x9000 | 53 | 1 081,040 | 491,00(USD/mt) |
| 14-12-4990 | 570 | 1006/SAE J403 | 250,00x1250x9000 | 31 | 685,620 | 491,00(USD/mt) |
| 14-12-4991 | 574 | 1008/SAE J403 | 250,00x1120x9000 | 61 | 1 203,110 | 491,00(USD/mt) |
| 14-12-4992 | 575 | 1008/SAE J403 | 250,00x1150x8700-9000 | 80 | 1 619,300 | 491,00(USD/mt) |
| 14-12-4993 | 576 | 1008/SAE J403 | 250,00x1250x9000 | 70 | 1 541,300 | 491,00(USD/mt) |
| 14-12-4994 | 577 | 1008/SAE J403 | 250,00x1290x9000 | 55 | 1 246,580 | 491,00(USD/mt) |
| 14-12-4995 | 579 | 1010/SAE J403 | 250,00x1080x9000 | 46 | 874,100 | 491,00(USD/mt) |
| 14-12-4996 | 580 | 1010/SAE J403 | 250,00x1120x8970-9000 | 53 | 1 043,780 | 491,00(USD/mt) |
| 14-12-4997 | 581 | 1010/SAE J403 | 250,00x1120x9000 | 45 | 911,400 | 491,00(USD/mt) |
| 14-12-4998 | 582 | 1010/SAE J403 | 250,00x1250x8970-9000 | 47 | 1 032,650 | 491,00(USD/mt) |
| 14-12-4999 | 584 | 1021/SAE J403 | 250,00x1120x8980-9000 | 95 | 1 874,620 | 500,00(USD/mt) |
| | | | Total | 636 | 13 113,500 | 6 455 600,08 USD |

**TOTAL AMOUNT 100,00%: 6 455 600,08 USD**
**TOTAL DUE: 6 455 600,08 USD**

*/Six million Four hundred and Fifty Five thousand Six hundred 8/100 USD/*

**DUE DATE: 14 March 2015**

BENEFICIARY: NOVEXCO (CYPRUS) LIMITED
BANK:              ING BELGIUM SA/NV BRUSSELS GENEVA BRANCH
                   Rue Petitot 6, P.O.Box 5613
                   CH 1211, Geneva 11
SWIFT:         BBRUCHGTXXX
Account No:   1071603 USD
Iban No:        IBAN: CH8108387000001071603
CORRESPONDING BANK:     Deutsche Bank Trust Company Americas

       SWIFT: BKTRUS33

*Novexco (Cyprus) Ltd, Registration number 208398*
*Registered address: 12 Egypt Street, 1097 Nicosia, Cyprus*

# EXHIBIT F

**AVERAGE BOND**
(To be signed by Receivers of cargo)

To the Owner(s) of the ...*vessel   tratroscope*...
and other parties to the adventure as their interests may appear.

Port of shipment: ...*Vitoria (Brasil)*... Port of destination/discharge: ...*Philadelphia (USA)*...

Bill of Lading or waybill number(s): ...*PXBRTUPHIPOSO0101  and  PXBRTUPHIPOSO0102*...

Quantity and Description of Goods: ...*1897 Prime Steel SLABs   wt  36.160,470*...
...*636 Prime Steel SLABs   wt  13.113,500*...
USD 19.443.066,61

Invoice Value (attach copy invoice or other evidence of value) ...*USD  6.455.660,48*...

In consideration of the delivery to us or to our order, on payment of the freight due, of the goods noted above we agree to pay the proper proportion of any salvage and/or general average and/or special charges which may hereafter be ascertained to be due from the goods or the shippers or owners thereof under an adjustment prepared in accordance with the provisions of the contract of affreightment governing the carriage of the goods or, failing any such provision, in accordance with the law and practice of the place where the common maritime adventure ended and which is legally due in respect of the goods from the shippers or owners thereof.  We also agree to furnish particulars of the value of the goods, supported by a copy of the commercial invoice rendered to us or, if there is no such invoice, details of the shipped value and to make a payment on account of such sum as is duly certified by the average adjusters to be properly payable in respect of the goods, and which is legally due in respect of the goods from the shippers or owners thereof.

**Non Separation Agreement**
It is agreed that in the event of the vessel's cargo or part thereof being forwarded to original destination by other vessel, vessels or conveyances, rights and liabilities in General Average shall not be affected by such forwarding, it being the intention to place the parties concerned as nearly as possible in the same position in this respect as they would have been in the absence of such forwarding and with the adventure continuing by the original vessel for so long as justifiable under the law applicable or under the Contract of Affreightment.  The basis of contribution to General Average of the property involved shall be the values on delivery at original destination unless sold or otherwise disposed of short of that destination; but where none of her cargo is carried forward in the vessel she shall contribute on the basis of her actual value on the date she completes discharge of her cargo.

RECEIVER OF GOODS: ...*OWNED (S) Naxeros (Cyprus) Limited*...

ADDRESS: ...*12, Egypt Street - 1097 Nicosia Cyprus*...

TEL NO: ...*+357 22 25 56 16*... FAX NO: ...*+357 22 83 51 61*... E-MAIL: ......

AUTHORISED SIGNATURE: ...*Stefou*... DATE ...*18|03|2015*...

Average Adjusters are:-   V. CHAKOS & CO.
Marine Claims Adjusters & Consultants
Contact Details:
59, Papanastasiou Street, 185 33 Piraeus, Greece
Tel.: +30 210 410 1000 Mob.: +30 6932 455 685
e-mail: adjusters@vchakos.com

---

**EXHIBIT**

F

# EXHIBIT G

## AVERAGE GUARANTEE
### (To be signed by Insurers of Cargo)

**NOTE:** This guarantee will only be accepted provided that no additions, deletions or amendments are made to it.

**To the Owners of the vessel "Fratzescos" and other parties to the adventure as their interests may appear.**

In consideration of the delivery in due course of the goods specified below to the consignees thereof without collection of a deposit, we, the undersigned insurers, hereby undertake to pay to the shipowners, on behalf of the various parties to the adventure as their interests may appear, any contribution to General Average and/or Salvage and/or Special Charges which may hereafter be ascertained to be legally due in respect of the said goods. We further agree:

a) to make a payment on account of such sum as is duly certified by the average adjusters to be properly payable in respect of the goods, and which is legally due in respect of the goods from the shippers or owners thereof.

b) to furnish to the said Average Adjusters at their request all information which is available to us relative to the value and condition of the said goods.

c) that this agreement shall be governed by English Law and the High Court of Justice of England and Wales shall have exclusive jurisdiction over any dispute arising out of this agreement and each party shall irrevocably submit to the jurisdiction of that Court.

**Non Separation Agreement**

It is agreed that in the event of the vessel's cargo or part thereof being forwarded to original destination by other vessel, vessels or conveyances, rights and liabilities in General Average shall not be affected by such forwarding, it being the intention to place the parties concerned as nearly as possible in the same position in this respect as they would have been in the absence of such forwarding and with the adventure continuing by the original vessel for so long as justifiable under the law applicable or under the Contract of Affreightment.  The basis of contribution to General Average of the property involved shall be the values on delivery at original destination unless sold or otherwise disposed of short of that destination; but where none of her cargo is carried forward in the vessel she shall contribute on the basis of her actual value on the date she completes discharge of her cargo.

| PORT OF LOADING | PORT OF DISCHARGE | BILL OF LADING | QUANTITY & DESCRIPTION OF GOODS | INVOICE VALUE (CIF) | PREMIUM |
|---|---|---|---|---|---|
| TUAPSE, RUSSIA | PHILADELPHIA, USA | PXBCTUPHFROS0101 | 1899 steel slabs (39.401.470 m/t) | USD 19,443,088.67 | |
| TUAPSE, RUSSIA | PHILADELPHIA, USA | PXBCTUPHFROS0102 | 636 steel slabs (13.113,500 m/t) | USD 6,455,600.08 | |

THIS GUARANTEE IS LIMITED TO 70% OF ANY CONTRIBUTION PAYABLE PURSUANT TO THIS GUARANTEE

POLICY/CERTIFICATE NUMBER OL/343657770 appl. 233

NAME OF INSURER: GENERALI ITALIA S.p.A.

NAME & ADDRESS: Genoa Branch Office – Via XII Ottobre 1 – 16121 Genova

TEL. NO. +39 010 55231   FAX NO. +39 010 5523631

AUTHORISED SIGNATURE                                    DATE 5th March 2015

Generali Italia S.p.A.

Average Adjusters are:

**V. CHAKOS & CO.**
Marine Claims Adjusters & Consultants
Contact Details:
89, Papanastasiou Street, 185 33 Piraeus, Greece
Tel.: +30 210 410 1000 Mob.: +30 6932 455 685
e-mail: adjusters@vchakos.com

**EXHIBIT**

G